STROUD PRODUCTION, L.L.C, Plantation Petroleum Corporation, and Robert A. Stroud, Appellants

v.

Patrick E. HOSFORD, Morris L. Etheredge, David T. Threinen, and Nelson E. Woods, Appellees.

No. 01–11–00593–CV.

Court of Appeals of Texas, Houston (1st Dist.).

March 5, 2013.

Garland Doty Murphy IV, Larry R. Veselka, Smyser Kaplan & Veselka, L.L.P., Houston, TX, for Appellants.

James L. Ware, Richard A. Sheehy, Sheehy, Ware & Pappas P.C., Houston, TX, for Appellees.

Panel consists of Chief Justice RADACK and Justices JENNINGS and KEYES.

## OPINION

TERRY JENNINGS, Justice.

Appellants, Stroud Production, L.L.C. ("Stroud Production"), Plantation Petroleum Corporation ("Plantation"), and Robert A. Stroud (collectively, the "Stroud defendants"),[1] challenge the trial court's judgment, entered after a jury trial, in favor of appellees, Patrick E. Hosford, Morris L. Etheredge, David T. Threinen, and Nelson E. Woods, in appellees' suit against the Stroud defendants for breach of contract, "intentional termination" of overriding royalty interests, conversion, tortious interference, and conspiracy. In twelve issues,[2] the Stroud defendants contend that appellees' "intentional termination claim does not exist under Texas law" and is not supported by legally- or factually-sufficient evidence; there is no evidence to support the "only damages" awarded by the jury; appellees' conversion claim is "barred by the economic loss doctrine and fails for lack of evidence;" there is no evidence that Stroud Production tortiously interfered with appellees' contract

---

1. The parties have listed ERG Resources, L.L.C. ("ERG") as an appellant, but ERG is not identified as a party in the trial court's judgment, and there are no issues pertaining to any judgment entered regarding ERG.

2. The Stroud defendants identify twenty issues in the section of their appellate brief entitled "Issues Presented," but the argument section of the brief does not track the substance or order of the twenty issues presented. We address the Stroud defendants' issues as argued in their brief.

with Plantation; appellees' alter ego and conspiracy claims "are barred" and are not supported by legally- or factually-sufficient evidence; the trial court's award of prejudgment interest is not supported by legally- or factually-sufficient evidence; there is no evidence that Plantation breached its obligations to appellees regarding payments owed for overriding royalties from January 2004; the trial court's award of attorney's fees was "on the wrong cause of action" and the fees were "improperly segregated;" the jury's alter ego findings conflict with its tortious interference and conspiracy findings; the trial court's judgment "suggests a quadruple recovery of attorney's fees;" and a new trial is required in light of appellees' "concealment of evidence" and the trial court's various erroneous evidentiary rulings.

We reverse and render in part, and we remand for a new trial on the issue of attorney's fees and a recalculation of prejudgment interest.

## Background

▇▇ In June 1978, the Houston Domestic Oil Company ("HDOC") obtained from two corporate lessors, Ruth M. Bowers and John B. Gordon, two oil and gas leases (the "B & G leases") on a 50–acre parcel of land located in the High Island area of Galveston County, Texas. Hosford signed the leases in his capacity as president of HDOC, and, pursuant to the terms of the B & G leases, the lessors, Bowers and Gordon, each retained a 25% "royalty interest" and HDOC obtained a 75% "working interest." [3] The B & G leases had a primary term of one year, were to remain in effect thereafter for so long as oil or gas was produced in commercial quantities, and were to terminate if production ceased for 90 continuous days without the commencement of "additional drilling or reworking operations."

▇▇ In September 1978, HDOC granted Hosford a 2% overriding royalty interest [4] in any oil and gas produced from the leases. Shortly thereafter, HDOC granted Etheredge a 2% overriding royalty interest and Threinen and Woods each a one-half percent overriding royalty interest. Thus, appellees collectively obtained from HDOC a 5% overriding royalty interest in production from the B & G leases.

HDOC drilled wells that produced oil in commercial quantities, and appellees, according to their assignments, received payments for their overriding royalty interests. Although ownership of the B & G leases subsequently changed hands several times, appellees retained their overriding royalty interests and continued to receive their payments for production until the end of December 2003, when Plantation acquired the leases.

**3.** We note generally that an oil and gas royalty is a share of the product or profit from real property, reserved by the grantor of a mineral lease, in exchange for the lessee's right to mine or drill on land. BLACK'S LAW DICTIONARY 1445 (9th ed.2009). "Royalty" is commonly defined as the landowner's share of production, free of expenses of production. *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121–22 (Tex.1996). An oil and gas "working interest" consists of the right to the mineral interest granted by an oil and gas lease, so called because the lessee acquires the right to work on the leased property, search, develop, and produce oil and gas, as well as the obligation to pay costs. BLACK'S LAW DICTIONARY at 1745.

**4.** An overriding royalty interest is a non-participating interest in a mineral lease. *Ridge Oil Co., Inc. v. Guinn Invs., Inc.*, 148 S.W.3d 143, 155 (Tex.2004). An owner of an overriding royalty "has no right and thus no ability to go onto the underlying property and drill or otherwise take action to perpetuate a lease." *Id.* Rather, such an owner is dependent on the lessee to preserve the lease. *Id.*

In late 2002 and early 2003, Stroud, who held other lease interests, became interested in acquiring the B & G leases because he had concluded that the Bowers and Gordon properties were "capable of more production" and contained "substantial" untapped reserves. Stroud Production, owned and managed solely by Stroud, hired a landman to investigate the prospect. And Stroud learned that Union Seaboard held the B & G leases, appellees possessed, collectively, their 5% overriding royalty interest, and Bowers and Gordon (and their assigns) retained a 25% royalty interest. In August 2003, Stroud Production offered to purchase the B & G leases from Union Seaboard for $58,000.

Plantation, a company of which Stroud was president and the sole employee, bought the B & G leases on December 1, 2003 for $58,000. Stroud Production became the operator of the leases, under which there was only one producing well operating. Union Seaboard, the prior lessor, had been reporting the ongoing production from the well to the Texas Railroad Commission. It is undisputed that this well continued to produce oil in December 2003 and part of January 2004. Although the Stroud defendants paid appellees their overriding royalty interests from the well's production in December 2004, they did not pay appellees for their overriding royalty interests for the January 2004 oil production until April 2010, shortly before the underlying trial. The Stroud defendants asserted that they did not pay appellees for this month of production because of an oversight.

On January 13, 2004, Stroud Production's landman obtained copies of the assignments of appellees' overriding royalty interests, and he advised Stroud Production that none of appellees' assignments contained "renewals and extensions" clauses. The evidence reveals that "renewals

and extensions" clauses may be used to protect overriding royalty interests by ensuring that such interests apply to any leases that qualify as renewals or extensions of prior leases. Stroud admitted that it was "probably a mistake" on his part not to have included a renewal s-and-extensions clause in the instrument assigning him his overriding royalty interest, but he had not anticipated a need for such a clause and did not realize that his interest would be subsequently "wash[ed] out" by a lessee. On January 20, 2004, a few days after Stroud Production received notice that appellees did not have renewals and extensions clauses in their assignments, a "polished rod" on the only producing well operating under the leases broke, and production ceased. Stroud's lawyer advised him that he had no obligation to pay the overriding royalty interest owners once the well had ceased production.

In his testimony, Stroud agreed that he was the "decision maker" for both Stroud Production and Plantation. And he knew that after the only remaining producing well operating under the B & G leases ceased production, the Stroud defendants had 90 days to commence work under the leases or they would terminate. Stroud explained that he did not order repairs to the well because of the expenses, but also because he had already offered interests in the property to other investors, albeit under other leases, which are discussed in more detail below. Although Stroud acknowledged that the necessary repairs for the broken well "weren't out of the normal," none of the Stroud defendants conducted repairs or undertook "additional drilling or reworking operations" during the 90–day period after the well had ceased production. Because nothing was done during the 90–day period, the B & G leases terminated on April 20, 2004. Stroud admitted that he intentionally returned the well to production in June 2004

only after the B & G leases had terminated, new leases had been obtained, and the 90–day continuous-operations period had passed. He also admitted that he "did not want any overriding royalty interest on the new leases" and appellees' overriding royalty interests had been "washed out."

Stroud further testified that even before Plantation had acquired the B & G leases from Union Seaboard and before the polished rod on the producing well had broken, he had been interested in obtaining new leases on the same land because he had concerns about the validity and scope of the B & G leases. On February 19, 2004, less than one month after the polished rod on the well had broken and during the 90–day continuous-operations period, Plantation entered into a new lease with Bowers. The new lease applied to the same 50–acre parcel of land covered by the old lease and provided the same royalty structure, but it included other terms that differed from the original B & G lease, such as a different primary term. And the new lease was not burdened by the overriding royalty interests held by appellees under the old B & G lease. Plantation also executed a new lease with Gordon.[5] We, as do the parties, refer to these new leases collectively as the "McNeil leases."

The Stroud defendants continued to evaluate the potential production of the well during the 90–day continuous-operations period under the B & G leases. Shortly after the 90–day period expired, Stroud, on April 29, 2004, made a presentation to a group of potential investors, representing that Stroud intended to repair the broken well and conduct additional work. Concluding that the B & G leases had expired, Stroud repaired the broken well in May 2004 at a cost of approximately $7,500, and resumed production from the well shortly thereafter under the McNeil leases. The Stroud defendants also conducted other new work pursuant to the McNeil leases. Because the McNeil leases were no longer subject to the overriding royalty interests, Plantation's net revenue interest totaled 75%. The McNeil leases were subsequently assigned to Stroud Production and, in 2007, Stroud Production sold the McNeil leases to ERG for approximately $2.5 million, and production from the leases continued.[6]

Following the presentation of evidence, the trial court granted a directed verdict in favor of the Stroud defendants on appellees' claims for "breach of duty of good faith and fair dealing," fraudulent concealment, and "breach of implied covenant to develop." The remaining claims were submitted to the jury, which found that Plantation failed to comply with an agreement to pay appellees overriding royalties from the B & G leases for January 2004; Plantation "intentionally terminate[d] the [B & G] Leases to destroy [appellees'] rights to their overriding royalty interests"; Plantation converted appellees' "proceeds from their overriding royalty interests" in the B & G Leases; Stroud Production intentionally interfered with appellees' rights to receive their overriding royalties under the B & G Leases; Stroud was responsible for the conduct of both Plantation and Stroud

---

**5.** In their briefing, the Stroud defendants assert that in May 2004, after the B & G leases expired, Plantation obtained a new lease from the Gordon interest. There is no record citation to this new lease, but the parties appear to agree that the Stroud defendants acquired new leases from both Bowers and Gordon or their successors and assigns.

**6.** The parties, in their briefing, generally agree, or at least do not dispute, that production continued on the parcel of land previously covered by the B & G leases.

Production; Stroud Production and Stroud were part of a conspiracy with Plantation and acted with an "intent to deprive [appellees] of the proceeds from their overriding royalty interests;" and Stroud and Stroud Production conspired to damage appellees. In a single damages question pertaining to all of the above causes of action, the trial court asked the jury to calculate an amount that would reasonably compensate appellees for damages caused by the Stroud defendants. The trial court instructed the jury to consider "only" the "unpaid overriding royalties from the [B & G] Leases" and asked it to calculate such damages for three time periods: (1) January 1, 2004 to January 20, 2004 (before production on the B & G leases ceased), (2) January 21, 2004 to January 1, 2007, and (3) January 1, 2007 to present. The jury awarded damages to appellees for each of the identified time periods. The damages awarded by the jury for the time period January 1, 2004 to January 20, 2004 represented the amount to which appellees were entitled to recover for their overriding royalty interest in the B & G leases prior to the well ceasing production on January 20, 2004. The parties appear to agree that the damages awarded by the jury for the other two time periods generally reflect the amounts that appellees would have received if they had retained their overriding royalty interests in the production that occurred under the McNeil leases.

In its final judgment, the trial court ordered that Hosford and Etheredge each recover from the Stroud defendants actual damages of $196,150,[7] plus pre-judgment interest in the amount of $32,043.75, and Threinen and Woods each recover from the Stroud defendants actual damages of $49,037.50, plus pre-judgment interest in the amount of $8,010.94. The trial court

also awarded appellees attorney's fees of $359,479.10, which included appellate attorney's fees.

## Breach of Contract

In their eighth issue, the Stroud defendants argue that the evidence is legally insufficient to support the jury's breach-of-contract finding pertaining to the payment of overriding royalties for production that occurred under the B & G leases during January 2004 because appellees were "issued checks in April 2010 for all January 2004 production and stock tank oil." In regard to the timing of the payments, the Stroud defendants assert that the "jury was not asked to determine when payments were made" and "no time period for payment was specified" in the question submitted to the jury.

■■■ In conducting a legal-sufficiency review of the evidence, we must consider all of the evidence in the light most favorable to the verdict and indulge every reasonable inference that would support it. *City of Keller v. Wilson,* 168 S.W.3d 802, 822 (Tex.2005). We will sustain a legal-sufficiency or "no evidence" challenge if the record shows one of the following: (1) a complete absence of evidence of a vital fact, (2) rules of law or evidence bar the court from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a scintilla, or (4) the evidence establishes conclusively the opposite of the vital fact. *Id.* at 810. In conducting a legal-sufficiency review, a "court must consider evidence in the light most favorable to the verdict, and indulge every reasonable inference that would support it." *Id.* at 822. The term "inference" means,

---

7. The actual damages awarded by the trial court in its judgment appear to include the amount found by the jury to have been owed for outstanding royalties from January 2004.

In the law of evidence, a truth or proposition drawn from another which is supposed or admitted to be true. A process of reasoning by which a fact or proposition sought to be established is deduced as a logical consequence from other facts, or a state of facts, already proved. . . .

*Marshall Field Stores, Inc. v. Gardiner,* 859 S.W.2d 391, 400 (Tex.App.-Houston [1st Dist.] 1993, writ dism'd w.o.j.) (citing Black's Law Dictionary 700 (5th ed. 1979)). For a jury to infer a fact, "it must be able to deduce that fact as a logical consequence from other proven facts." *Id.*

 If there is more than a scintilla of evidence to support the challenged finding, we must uphold it. *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.,* 960 S.W.2d 41, 48 (Tex.1998). "'[W]hen the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence.'" *Ford Motor Co. v. Ridgway,* 135 S.W.3d 598, 601 (Tex.2004) (quoting *Kindred v. Con/Chem, Inc.,* 650 S.W.2d 61, 63 (Tex.1983)). If the evidence at trial would enable reasonable and fair-minded people to differ in their conclusions, then jurors must be allowed to do so. *City of Keller,* 168 S.W.3d at 822; *see also King Ranch, Inc. v. Chapman,* 118 S.W.3d 742, 751 (Tex.2003). "A reviewing court cannot substitute its judgment for that of the trier-of-fact, so long as the evidence falls within this zone of reasonable disagreement." *City of Keller,* 168 S.W.3d at 822.

The trial court asked the jury whether Plantation "fail[ed] to comply with the agreement to pay [appellees] their overriding royalties on production from the [B & G] Leases for January 2004." The jury answered "yes" and then awarded Hosford and Etheredge $150 and Threinen and Woods $37.50 for damages incurred from January 1, 2004 until January 20, 2004. And the trial court included these amounts in the actual damages that it awarded to appellees in its judgment.

 It is undisputed that appellees did not receive these payments, which were due and owing, until April 2010, shortly before trial. During trial, Hosford complained about the lateness of these payments, noting that he had not received any interest. The jury's breach-of-contract finding is supported by evidence that Plantation failed to timely make the payments. *See* TEX. NAT. RES.CODE ANN. § 91.402(a) (Vernon 2011) (providing, "If the lease or other agreement does not specify the time for payment, subsequent proceeds must be paid no later than: (1) 60 days after the end of the calendar month in which subsequent oil production is sold; or (2) 90 days after the end of the calendar month in which subsequent gas production is sold"); *id.* § 91.403 (Vernon 2011) (providing for the payment of interest on late payments). Although the Stroud defendants presented evidence that Plantation's failure to timely make the payments was the result of a "mistake," the jury could have reasonably inferred that, by making contractually required payments over six years after they were due, Plantation breached its contract to pay the overriding royalties to appellees. Accordingly, we hold that the evidence is legally sufficient to support the jury's finding that Plantation failed to comply with its contractual obligation to pay appellees their overriding royalties on production from the B & G leases for January 2004 and the trial court did not err in entering judgment in appellees' favor on this claim.

We overrule the Stroud defendants'

eighth issue.[8]

## Duty Owed to Overriding Royalty Interests

In their first issue, the Stroud defendants argue that the trial court erred in entering judgment in favor of appellees on their claim for "intentional termination" of their overriding royalty interests because the claim does not exist under Texas law, Plantation had no contractual obligation to perpetuate the B & G leases for the benefit of appellees, Plantation owed no fiduciary duty and had no special relationship with appellees, there are no "public policy reasons for the creation of a new fiduciary duty" owed to appellees, and "the retroactive application of a fiduciary obligation" in this case "would be inequitable given Plantation's reliance on settled Texas law." The Stroud defendants further argue that the evidence is legally and factually insufficient to support the jury's finding that Plantation intentionally terminated the B & G leases to destroy appellees' right to their overriding royalty interests because the B & G leases expired "according to their terms" and not as a result of an intentional act committed by Plantation. Finally, the Stroud defendants argue that the trial court erred in submitting the "intentional termination" question to the jury because the question "lacked sufficient instructions to provide a standard to guide the jury in assessing the conduct of Plantation."

The record contains evidence supporting the jury's finding that the Stroud defendants "intentionally terminated" the B & G leases to "destroy" appellees' overriding royalty interests in the B & G leases.[9] There is no evidence that any Stroud defendant committed any deliberate act in connection with the breaking of the rod on the producing well that was operating under the B & G leases. However, there is sufficient evidence to support an implied finding that, after the well ceased production, the Stroud defendants elected not to repair the well so that the B & G leases would expire, appellees' overriding royalty interests would be extinguished, and the Stroud defendants would benefit financially by resuming production under new leases that were not burdened by appellees' interests. Appellees also presented evi-

---

8. The Stroud defendants' eighth issue presents a challenge to the liability finding on the breach-of-contact claim. During trial, appellees conceded that the Stroud defendants, shortly before trial, had paid the outstanding royalties for January 2004. The trial court's judgment reflects that it included the principal amounts awarded by the jury for the January 2004 royalties in its award of actual damages, even though those amounts had already been paid. The Stroud defendants raise this matter in their second issue, which we address below.

9. The parties expend considerable effort in arguing whether the record contains any evidence from which the jury could have reasonably inferred that the Stroud defendants "sabotaged" the producing well operating under the B & G leases. However, even accepting that there is no evidence of sabotage, there is ample evidence that Plantation, along with the other Stroud defendants, intentionally sought to terminate the B & G leases.

> We note that a party may, of course, intentionally and lawfully terminate a contract in accord with the contract's terms. The Stroud defendants themselves asserted that, rather than continuing under the B & G leases, they sought to acquire new leases, necessarily giving rise to an inference that they sought to terminate the B & G leases. In regard to whether Plantation sought to destroy appellees' overriding royalty interests, Stroud himself testified that he did not want appellees' overriding royalty interests burdening the McNeil leases. As explained above, the jury could have reasonably inferred from Stroud's own testimony that Plantation terminated the B & G leases, at least in part, to divest appellees of their interests.

dence that, both before and after the well had ceased production, the Stroud defendants were seeking to acquire new leases on the same property that had been subject to the B & G leases; the Stroud defendants chose not to repair the well even though such repairs could have been completed at reasonable cost compared to what the Stroud defendants had already spent on the B & G leases; the Stroud defendants chose not to repair the well during the 90–day continuous-operations period even though they were convinced that the property held "substantial" untapped reserves; the Stroud defendants were making plans to market interests in the new leases during the 90–day continuous-operations period; and shortly, after the B & G leases expired, the Stroud defendants repaired the well and production resumed under the new McNeil leases unburdened by appellees' overriding royalty interests. In sum, the record contains evidence that the Stroud defendants intentionally terminated the B & G leases to, at least in part, terminate appellees' interests.

However, whether the Stroud defendants' conduct is actionable under Texas law is a separate matter. In determining the existence and scope of what duty, if any, Plantation, as the lessee under the B & G leases, owed to appellees, the holders of overriding royalty interests in production from the B & G leases, we first consider the Texas Supreme Court opinions in *Sunac Petroleum Corp. v. Parkes*, 416 S.W.2d 798 (Tex.1967), *and Ridge Oil Co. v. Guinn Investments, Inc.*, 148 S.W.3d 143 (Tex.2004).

In *Sunac*, Parkes sold and assigned to a third party a mineral lease that was later transferred to Sunac. 416 S.W.2d at 799–800. Parkes reserved an overriding royalty interest in production from this lease and "any extension or renewal," but the assignment of this lease to Sunac also included a surrender clause, relieving Sunac of any obligation to continue the lease. *Id.* When the lessor questioned the validity of the lease held by Sunac, Sunac procured a new lease on the same land, but with different terms, and Sunac stopped paying the overriding royalties owed to Parkes under the original lease. *Id.* at 800. Parkes contended that his overriding royalty interest applied under the new lease. *Id.* After considering the language of the leases, the Texas Supreme Court concluded that the original lease had terminated and the new lease, which was executed on "substantially different terms," was not a renewal or extension. *Id.* at 802–03.

The supreme court acknowledged that courts in other jurisdictions had, on certain facts, recognized the existence of a "constructive trust" in favor of an overriding royalty interest holder on the basis of "specific language in the assignment" or a "close relationship between the parties." *Id.* at 803. For example, the court explained that other courts had relied upon "relationships of trust and confidence" in concluding that a new lease constituted a "renewal or extension" of an original. *Id.* And the court noted that other courts had offered protection to overriding royalty interest holders in a "washout transaction," which "generally involve[ed] some bad faith on the part of the lessee" and arose when a new lease was taken before the expiration of the original and the original lease was "simply permit[ted] ... to expire." *Id.* at 804 (citing *Oldland v. Gray*, 179 F.2d 408 (10th Cir.1950)).

Turning to the facts before it, the Texas Supreme Court noted that, other than the renewals and extensions clause in the instrument granting the overriding royalty interest, there was no evidence of a relationship of trust or confidence between Parkes and Sunac. *Id.* Sunac had ob-

tained the new lease "to protect its interest" only after the lessor had raised concerns about the prior lease. *Id.* The court recognized that renewals and extensions clauses had been cited by other courts as creating a "fiduciary relation," but it construed the renewals and extensions clause in the overriding royalty instrument together with the surrender clause in the lease and concluded that the surrender clause relieved Sunac from any "duty to perpetuate the lease, and thus the overriding royalty." *Id.* The court explained that, "[n]ormally, when an oil and gas lease terminates, the overriding royalty created in an assignment of the lease is likewise extinguished" and, "generally, ... the assignment of an oil and gas lease reserving an overriding royalty in the assignor does not usually create any confidential or fiduciary relationship between the assignor and his assignee." *Id.* Because no evidence supported the existence of a "confidential or fiduciary relationship" and the provisions of the leases and assignment were "controlling," the court held that the overriding royalty interest expired with the original lease and no constructive trust was warranted. *Id.* at 805.

In *Ridge Oil,* two lessees, Ridge and Guinn, obtained working interests in adjoining tracts of land under a single base lease. 148 S.W.3d at 147–48. The only two producing wells on the entire lease, which were sustaining the lease, were located on the Ridge tract. *Id.* Ridge devised a plan to terminate the entire base lease and obtain new leases on both tracts by shutting off the electricity to the two producing wells for 90 days. *Id.* at 148. After Ridge effectuated his plan and obtained new leases, Guinn sued Ridge for tortious interference and recognition of a constructive trust, contending, in part, that Ridge could not lawfully "washout" his interest. *Id.* at 148–49, 153. Guinn asserted that a lessee could not lawfully surrender

or terminate a lease "to destroy the rights of another partial assignee of the lessee's interest." *Id.* at 155. The Texas Supreme Court denied Guinn's request to impose liability for this conduct, stating

> Even if such a rule of law *might be appropriate in the context of overriding royalty interests* when the underlying lease does not contain an express release provision, *a question we do not address,* there is a material distinction between an overriding royalty interest and that of a lessee. An overriding royalty interest is a non-participating interest. A royalty owner has no right and thus no ability to go onto the underlying property and drill or otherwise take action to perpetuate a lease. An overriding royalty interest owner is wholly dependent on the lessee to keep a lease alive. That is not true of a lessee. A lessee in Guinn's position could continue a lease in effect by drilling a well and obtaining production, or continuing operations until production is obtained, under lease provisions like those in the 1937 lease.

*Id.* (emphasis added).

The supreme court held that Ridge owed no duty to Guinn to continue the original lease and, thus, the original lease terminated by its own terms. *Id.* at 155–57, 160–61 ("Ridge owed no duty to Guinn to perpetuate the 1937 lease or to procure its renewal or extension for Guinn."). The court concluded that Guinn was not entitled to a constructive trust under any new leases on the Guinn tract because there was no "confidential relationship" between partial assignees of leasehold interests under a single lease. *Id.* at 160. And it further concluded that there was no basis for a tortious interference claim. *Id.* at 160–61.

The Texas Supreme Court's opinions in *Sunac* and *Ridge Oil* indicate that the existence and scope of any duty owed by a lessee to the holder of an overriding royalty interest is an open question under Texas law. However, these opinions direct us to carefully consider the language of controlling documents and the circumstances and relationships of the parties to determine whether any such duty is owed and, thus, whether any actionable wrong has been committed by a lessee who seeks to "intentionally terminate" a lease so as to divest the holder of an overriding royalty interest of his interest.

One Texas court has considered claims, similar to those presented here, that were brought by an overriding royalty interest holder who claimed that his interest had been washed out in "bad faith." *Sasser v. Dantex Oil & Gas, Inc.*, 906 S.W.2d 599, 601–02 (Tex.App.-San Antonio 1995, writ denied). In *Sasser*, which the supreme court in *Ridge Oil* characterized as "instructive," Sasser held an overriding royalty interest under an original lease in which Dantex, the lessee, held a 75% working interest. *Id.* at 601. Sasser's overriding royalty interest did not apply to renewals or extensions of the original lease, and the lease also permitted Dantex unilaterally to surrender it at any time. *Id.* After Dantex and the mineral owner subsequently entered into a new lease, Sasser argued that his overriding royalty interest was not extinguished because there had been production in paying quantities occurring under the original lease at the time that the new lease was executed. *Id.* Sasser accused Dantex of wrongfully attempting to "eliminate or 'washout' [his] overriding royalty interest" in the original lease,

"thereby breaching its duty of good faith and fair dealing or other fiduciary-type duty." *Id.* The San Antonio Court of Appeals rejected imposing any such duty, holding that the original lease had terminated when Dantex executed the new lease "with the intent and understanding that" the original lease was released; and the court explained that it was "not material" whether there was production in paying quantities at the time. *Id.* at 603–04.

Sasser asserted that " 'evolving principles of Texas law' mandate[d] the conclusion that an oil and gas lessee owes an overriding royalty interest owner a duty of good faith not to engage in intentional acts designed to eliminate or 'washout' the overriding royalty interest owner." *Id.* at 605–06. The court disagreed, noting first that the lease contained a surrender clause and Sasser's assignment, which created his overriding royalty interest, did not contain a renewals and extensions clause. *Id.* at 606. Second, the court noted that there were no facts to establish a confidential or fiduciary relationship. *Id.* at 606–07. The court characterized Sasser's bad-faith claims as being "circular": Sasser argued that a duty of good faith should be imposed *because* there was evidence of bad faith. *Id.* at 607. And it explained that Dantex's acts would have been in "bad faith" only if its contractual right to surrender the original lease had been subject to a duty to act in "good faith" and the "method by which a lease is terminated— so long as it is contractually permitted—is a distinction without a difference." *Id.* In sum, the court held that Dantex did not owe Sasser a "duty of good faith and fair dealing or any other fiduciary-type duty."[10] *Id.*

10. The court emphasized that the *"contractual right to unilaterally terminate the lease,* coupled with the absence of any facts justifying the imposition of a confidential or fiducia-ry relationship," defeated Sasser's arguments for the imposition of some type of duty of good faith. *Sasser v. Dantex Oil & Gas, Inc.,*

Other Texas courts have similarly been reluctant to recognize any sort of duty, fiduciary or otherwise, flowing from a lessee to the holder of an overriding royalty interest. For example, in *Exploration Company v. Vega Oil & Gas Company,* the holder of overriding royalty interests in original mineral leases contended that new leases, which were obtained over one year after the old leases had expired and which involved different terms and parties, constituted renewals and extensions of the original leases. 843 S.W.2d 123, 124–25 (Tex.App.-Houston [14th Dist.] 1992, writ denied). Our sister court held that the lessee had established as a matter of law that the leasehold estate under the old leases had expired as a result of non-production, and, thus, the overriding royalty interests in the old leases had also expired. *Id.* at 125. The court noted that there was no authority in Texas supporting the arguments of the overriding royalty interest holders that the lessee owed them a fiduciary obligation or a constructive trust on the new leases was warranted. *Id.* at 126. The court explained that the "mere assignment of an oil and gas lease reserving an overriding royalty interest does not in itself create a confidential or fiduciary relationship between the assignor and assignee" and "[i]f such a relationship is created, it must be by the terms of the assignment or by other acts of the parties." *Id.* The court concluded that the renewals and extensions clause, and a separate notice clause, did not impose a fiduciary obligation on the lessee. *Id.* at 126–27. The court further concluded that "merely because" the lease did not contain a surrender clause did not "mean that a fiduciary relationship exist[ed]." *Id.* at 126. Because there was no evidence of fraud, bad faith, or the existence of a fiduciary relationship, and because there

was "no Texas case law expressly support[ing] [the] imposition of a fiduciary relationship or constructive trust" on the facts before it, the court held that no overriding royalty interest applied to the new leases. *Id.* at 127.

In *McCormick v. Krueger,* the holders of overriding royalty interests in an oil and gas lease contended that the owners of the working interest had "washed out" their interests by allowing "the lease to expire;" they asserted that the holder of a new lease, who had bought the leasehold equipment from the working interest owners, was bound to honor their overriding royalty interests. 593 S.W.2d 729, 729 (Tex. Civ.App.-Houston [1st Dist.] 1979, writ ref'd n.r.e.). The overriding royalty interest holders were protected by renewals and extensions clauses in their assignments, but this Court noted that it was undisputed that the original leases had expired at the time the new leaseholder had acquired the leasehold and equipment. *Id.* at 731. We held that the new leaseholder was not obligated to honor the overriding royalty interests. *Id.*

In *Wagner v. Sheets & Walton Drilling Company,* the court considered whether an overriding royalty interest that burdened an original lease should be "equitably impress[ed]" on a new lease covering the same land. 359 S.W.2d 543, 544–45 (Tex.Civ.App.-Eastland 1962, writ ref'd n.r.e.). The original lease provided that it expired in the absence of production at the end of the primary term. *Id.* at 545. Moreover, the "continuation of the overriding royalty" in the original lease "depended upon the continuation of the lease;" there was no provision requiring that the lease be maintained beyond its primary term, and there were no provisions in the assignments providing that the overriding

906 S.W.2d 599, 607 (Tex.App.-San Antonio 1995, writ denied) (emphasis added).

royalties would be continued in any new leases on the same property. *Id.* The lessee had permitted the original lease to expire and had re-leased (almost all of) the same land, but the court stated that the lessee had done "no more than that which [it] had the right to do under the [original] lease and the assignments." *Id.* at 545–46. Concluding that the original lease had expired by its own terms and the new lease was not an "extension" of the prior lease, the court explained,

> True, it would have been greatly to the advantage of the holders of the overriding royalty interest for the [original] lease to be perpetuated in toto or that such overriding royalty be continued in effect as to all lands covered by such lease in any new lease agreement. The holders of the [original] lease, however, had no such obligation. There was *no* fiduciary relationship between the parties which required the holders of that lease to maintain it or the overriding royalty interest of appellant in force as to all the land involved therein.

*Id.* at 546. Thus, the court held that there was no basis on which to impress the new lease with the overriding royalty that burdened the original lease. *Id.*

In *Fain & McGaha v. Biesel,* the holder of overriding royalty interests contended that their interests should be applied to the portion of the lease that had been voluntarily surrendered and any new leaseholders obtaining a lease from the mineral owners should have to take the lease "burdened by the same obligation." 331 S.W.2d 346, 347–48 (Tex.Civ.App.-Fort Worth 1960, writ ref'd n.r.e.). Noting that the original lease permitted the lessee to surrender the lease at any time, the court explained,

> *[U]nless the instrument creating the overriding or royalty interest as an estate in itself makes express provision to the contrary,* the interest continues or ceases with the leasehold estate out of which it is carved and cannot survive termination by surrender or release of the leasehold estate by the owners.

*Id.* at 348 (emphasis added).

Finally, we consider two cases from the Unites States Court of Appeals for the Fifth Circuit. In *Keese v. Continental Pipe Line Company,* holders of overriding royalty interests in an original lease that had been surrendered by the lessee contended that their interests should be applied to a new lease. 235 F.2d 386, 387–90 (5th Cir.1956). The court stated that "unless … the instrument creating the overriding or royalty interest makes express provision to the contrary, the interest continues or ceases with the leasehold estate out of which it is carved and cannot survive termination by surrender or release of the leasehold estate by the owners." *Id.* at 388. In addressing the plaintiffs' arguments that lessee had surrendered the lease in bad faith, the court explained,

> Assuming, without deciding, that the surrender to the mineral owners by the holders of the leasehold estate could, under any state of facts, operate to give the owners of the override an interest in oil produced not under the lease from which the override was carved but under a new one issued by the mineral owners to a different lessee, *though in the state of the authorities affirming the right of the lessee to do just that, it is difficult to assume any state of facts which could do so,* it is quite clear that no such facts or circumstances are presented or pointed to by plaintiffs.

*Id.* at 388 (emphasis added). The court concluded that the "remote assignees in the leasehold chain of title[ ] were under no obligation to plaintiffs to drill or to continue to hold on to the lease," and the fact that the assignee "knew or might have

known that a good well could be brought in on the property, could not have prevented them from surrendering the lease to the landowners for *any reason or for no reason at all.*" *Id.* at 389 (emphasis added). The court explained that "[t]he exercise by one man of a legal right cannot be a legal wrong to another" and "whatever one has a right to do, another cannot have a right to complain."[11] *Id.* (quoting *Montgomery v. Phillips Petroleum Co.*, 49 S.W.2d 967, 971 (Tex.Civ.App.-Amarillo 1932, writ ref'd)).

In *In re GHR Energy Corp.*, the court considered an overriding royalty agreement that included a renewals or extensions clause but also provided that preservation of the lease was "solely at the will [of the lessee]." 972 F.2d 96, 99 (5th Cir.1992). Even though production never ceased, the lessee terminated the lease and entered into new leases, thereby extinguishing the overriding royalty owner's interest in the original lease. *Id.* The court held that the lessee "was free to terminate the leasehold estate" and "cut off" the overriding royalties pursuant to the lease's surrender clause, despite the fact that gas production never ceased. *Id.* at 100. However, on rehearing, the court noted, "We might well reach a different result if the facts here had suggested that [the lessee] surrendered its interest in the lease *to destroy* the rights of the overriding royalty interest owner." *In re GHR Energy Corp.*, 979 F.2d at 41 (emphasis added).

In sum, no Texas court has yet recognized that a lessee generally owes any type of duty, whether it be an implied contractual covenant or a fiduciary-type duty, to protect the interest of an overriding royalty interest holder so as to require the lessee to make repairs to well equipment, perpetuate the lease, and ensure that such overriding interests are not extinguished. As explained above, the Texas Supreme Court's opinions in *Sunac* and *Ridge Oil Company*, and the authority from Texas courts of appeals, indicate that we must consider the language of controlling documents and the circumstances and relationships of the parties to determine whether the Stroud defendants have committed an actionable wrong against appellees by allowing the B & G leases to expire with one of their intended purposes being to extinguish appellees' interests.

■■■ Here, other than the fact that appellees held overriding royalty interests in the B & G leases, there is no evidence of any special relationship of trust and confidence between appellees and Plantation. *See Sunac*, 416 S.W.2d at 804 (stating that "generally, ... the assignment of an oil and gas lease reserving an overriding royalty in the assignor does not usually create any confidential or fiduciary relationship between the assignor and his assignee"). Appellees acquired their overriding royalty interests in the B & G leases in the late 1970s. Plantation did not acquire its working interest in the B & G leases until December 2003. And appellees did not

**11.** The court further stated,

> Ordinarily, an assignment of a lease where assignor retains an overriding royalty interest without further provision does not create a fiduciary relationship between the assignor and assignee.
>
> . . . .
>
> The obligations of the payor or grantor of the oil payment, unless otherwise modified, go no further than those contained in his contract with the payee, and the rights and privileges of lessee under the lease may be exercised without liability to the holder of the oil payment. Thus, he may allow the lease to terminate under its terms for nonpayment of delay rentals or by surrender of the lease or by failure to drill.

*Keese v. Cont'l Pipe Line Co.*, 235 F.2d 386, 388 (5th Cir.1956) (citations omitted).

present any evidence upon which a court might find the existence of a fiduciary or confidential relationship. *See Exploration Co.*, 843 S.W.2d at 126–27 ("Other than the typical cases of fiduciary relationship, such as attorney-client, partners, close family relationships, and joint adventurers, a fiduciary relationship can arise if, over a long period of time, the parties have worked together in the joint acquisition and development of property before entering the agreement sought to be enforced.").

Turning to the specific language of the controlling documents, the assignments granting appellees their overriding royalty interests did not contain any renewals or extensions clauses. Texas courts have recognized that these types of clauses may provide some evidence of a fiduciary relationship or support a constructive-trust remedy. *See Sunac*, 416 S.W.2d at 804 ("The language most often pointed to by the courts as creating a fiduciary relation in this type of situation provides that the overriding royalty will apply to any extensions or renewals of the lease assigned."). However, Texas courts have also held that, even when this "phraseology" is present, a special or confidential relationship or duty may still be lacking. *See id.* (construing renewals and extension clause and surrender clause in lease together, and noting that lessee had no duty to continue lease in force but rather could surrender the lease at any time without consent of overriding royalty interest holders); *Exploration Co.*, 843 S.W.2d at 124, 126 (declining to impose fiduciary duty on lessee despite fact that assignment contained renewals and extensions clause and lease did not contain surrender clause). Here, Hosford admitted that the failure to include renewals and

extensions language in his assignment was a "mistake."

We recognize that the B & G leases do not contain express surrender clauses, and many courts that have declined relief to holders of overriding royalty interests, whether it be through a constructive trust or a claim based upon a fiduciary-type duty, have placed significant weight upon the nonexistence of such surrender clauses in leases and assignments. However, at least one court has stated that the absence of a surrender clause, even when there is also a renewals and extensions clause, does not result in the creation of a fiduciary relationship. *See Exploration Co.*, 843 S.W.2d at 124, 126. Based upon our review of Texas case law, we cannot say that the absence of a surrender clause in this case indicates the existence of some sort of special duty owed to appellees.

It is undisputed that the B & G leases terminated following 90 days of non-production. After production ceased, and during the 90–day continuous-operation period, the Stroud defendants obtained a new lease from Bowers. And they subsequently obtained a new lease from Gordon. Although the royalty structure remained the same, these new leases contained terms that materially differed from the B & G leases. And, although there were no surrender clauses in the B & G leases, appellees have not cited anything in the assignments of the overriding royalty interests or the B & G leases that obligated the Stroud defendants to repair the polished rod on the broken well or take other action to perpetuate the B & G leases. Appellees have also not cited any contractual provision that would have precluded the lessee and the lessors from entering into new leases.[12] Moreover, appellees

---

12. The trial court granted a directed verdict on appellees' claims arising from an alleged duty of good faith and fair dealing and a duty to develop the leasehold. Appellees have not challenged those rulings. They have also not argued to this Court that the Stroud defen-

have not cited any case law suggesting that any sort of implied covenant in an oil and gas lease supports their cause of action. Finally, we note that, at the end of trial, appellees conceded that they had not developed any claim based upon an implied duty to develop the B & G leases, and the trial court granted a directed verdict on this claim. Appellees have not appealed that portion of the judgment.

We recognize that the Texas Supreme Court, in *Ridge Oil*, and the Fifth Circuit, in *In re GHR Energy Corp.*, have at least suggested the possibility that a party that engages in conduct to intentionally wash-out an overriding royalty interest may be subject to liability. However, based upon the evidence before us, we cannot say the Stroud defendants committed an actionable wrong by intentionally terminating the B & G leases to extinguish the overriding royalty interests and acquiring new leases with the lessors. *See Keese*, 235 F.2d at 388 (stating that "[t]he exercise by one man of a legal right cannot be a legal wrong to another" and about "whatever one has a right to do, another cannot have a right to complain"). *Id.* Because there is no evidence that the Stroud defendants violated any express or implied contractual duty and there is no evidence of the existence of a fiduciary or confidential relationship, we hold that the trial court erred in entering judgment against the Stroud defendants based upon appellees' claim that they intentionally terminated the B & G leases to destroy appellees' overriding royalty interests.

We sustain the Stroud defendants' first issue.

### Conversion

In their third issue, the Stroud defendants argue that the trial court erred in entering judgment in favor of appellees based upon their conversion claim because this claim was "for contract damages," is "barred by the economic loss doctrine," and is based upon a "general debt satisfied by the payment of money." The Stroud defendants further argue that appellees' conversion claim is not supported by sufficient evidence because appellees received all the royalties they were due and had no interest in production from the McNeil leases.

The elements of a conversion claim are (1) the plaintiff owned or had possession of the property or entitlement to possession; (2) the defendant unlawfully and without authorization assumed and exercised control over the property to the exclusion of, or inconsistent with, the plaintiff's rights as an owner; (3) the plaintiff demanded return of the property; and (4) the defendant refused to return the property. *Khorshid, Inc. v. Christian*, 257 S.W.3d 748, 759 (Tex.App.-Dallas 2008, no pet.).

The trial court asked the jury whether Plantation had converted appellees' proceeds from their overriding royalty interests on the B & G leases. It instructed the jury that Plantation could be liable for conversion if it exercised dominion or control over the personal property of another without consent of the owner and to the exclusion of the owner's right of possession and use. As we have held above, appellees were not legally entitled to recover overriding royalties after the termination of the B & G leases. Accordingly, we hold that the trial court erred in entering judgment in favor of appellees based upon their conversion claim for "unpaid royalties" after the B & G leases had expired.

dants breached any sort of implied covenant or duty, which flowed to them, to develop the

leasehold estate.

As to the question of payment for overriding royalties due from January 2004, we have held that the evidence is legally sufficient to support the jury's finding that Plantation failed to comply with its contended obligation to pay appellees these royalties. Because we affirm the jury's liability finding on appellees' breach-of-contract claim related to the January 2004 royalties, we need not address whether liability for this portion of the judgment may also be sustained upon a conversion theory.

We sustain the Stroud defendants' third issue.

### Tortious Interference

In their fourth issue, the Stroud defendants argue that the trial court erred in entering judgment in favor of appellees based upon their tortious-interference claim because Plantation "never objected to the actions of its agent Stroud Production," "the collapse" of the existing well on the B & G leases "cannot be attributed to Stroud Production," and there is no evidence that the Stroud defendants "sabotaged" the well. The Stroud defendants assert that "although Stroud Production did not repair the well after its collapse, tortious interference requires a willful act."

Appellees argue that Stroud Production "made decisions about the lease" and interfered with its "contractual relationship" with Plantation by washing out their overriding royalty interests. Appellees assert that the jury could have found that the failure of the only well that was sustaining the B & G leases was not "coincidental" and Stroud Production, as the operator, "willfully and intentionally interfered with [their] overriding royalty interests."

■■■ The trial court asked the jury whether Stroud Production had intentionally interfered with appellees' rights, if any, to receive overriding royalties under the B & G leases. The jury found that it had. Again, as we have held above, appellees were not legally entitled to recover overriding royalties once the B & G leases terminated. At the time the B & G leases terminated, Plantation was the lessee. Stroud admitted that he was the decision maker for both Stroud Production and Plantation, but appellees have not cited any evidence that Stroud Production, as operator, was actually the party that may legally be charged with allowing the B & G leases to expire. In fact, appellees' "intentional termination" claim was brought against Plantation, not Stroud Production. Thus, even if such conduct was actionable, and we have held that it was not, Plantation would be the liable party for intentionally terminating the lease. Accordingly, we hold that the trial court erred in entering judgment in favor of appellees based upon their tortious-interference claim.

We sustain the Stroud defendants' fourth issue.

### Alter Ego

In their fifth issue, the Stroud defendants argue that appellees' "alter ego claims are barred because the trial court granted summary judgment on all fraud claims." In their tenth issue, the Stroud defendants argue that the jury's alter ego findings "fatally conflict" with the jury's tortious-interference and conspiracy findings because a party "cannot interfere with its own contract" and the jury's alter ego findings establish that "there are no separate entities capable of tortiously interfering with Plantation's contract or conspiring together to convert overriding royalty interest payments."

The trial court asked the jury whether Stroud was responsible for the conduct of Plantation, and it instructed the jury that

he was if he used Plantation "for the purpose of perpetrating and did perpetrate an actual fraud on [appellees] primarily for the direct personal benefit" of himself. The jury found that Stroud was responsible for the conduct of Plantation. The trial court also asked the jury whether Stroud was responsible for the conduct of Stroud Production, and it instructed the jury that he was responsible if Stroud Production was organized as a mere tool or business conduit of Stroud, there was such unity of purpose between Stroud and Stroud Production that the separateness of Stroud Production ceased, and holding only Stroud Production liable would result in injustice. The jury also found that Stroud was responsible for the conduct of Stroud Production.

We have previously held that all underlying causes of action against Stroud Production fail as a matter of law. Accordingly, there is no basis on which to hold Stroud responsible for the conduct of Stroud Production. We have also previously held that all underlying causes of action against Plantation, except for the breach-of-contract claim pertaining to appellees' overriding royalties on production from the B & G leases for January 2004, fail a matter of law. In regard to the remaining issues, having held that Plantation did not commit an actionable wrong under Texas law by intentionally terminating the B & G leases to destroy appellees' interests, we further hold that there is no basis upon which to sustain an alter ego finding against Stroud individually. Accordingly, we need not address the Stroud defendants' fifth and tenth issues.

## Conspiracy

In their sixth issue, the Stroud defendants argue that the trial court erred in entering judgment in favor of appellees based on their conspiracy claims because

appellees "other causes of action fail." We agree and hold that appellees' are not entitled to judgment against the Stroud defendants based upon a conspiracy claim.

We sustain the Stroud defendants' sixth issue.

## Prejudgment Interest

In their seventh issue, the Stroud defendants argue that the trial court erred in awarding appellees prejudgment interest because appellees' underlying causes of action fail and, even if there is a valid claim, appellees "calculated interest using the wrong date." Specifically, the Stroud defendants complain that it was error to use July 2005 as the date to begin to calculate prejudgment interest for each appellee because a July 2005 demand letter, upon which the award of prejudgment interest was based, referred only to Hosford individually and not the other appellees.

■ We have concluded that the only claim upon which appellees are entitled to recover is their breach-of-contract claim pertaining to Plantation's failure to timely pay their overriding royalties on production from the B & G leases for January 2004. Accordingly, we hold that the trial court erred in its award of prejudgment interest to appellees. In light of the fact that we are reversing the overwhelming majority of the damages awarded to appellees, we remand the case for a recalculation of prejudgment interest.

We sustain the Stroud defendants' seventh issue.

## Attorney's Fees

In their ninth issue, the Stroud defendants argue that the trial court erred in awarding appellees their attorney's fees because their claim for "intentional termination" is not a claim based in contract and such a claim, if it existed, would be a tort

claim for which attorney's fees are not recoverable. The Stroud defendants further argue that the trial court erred in awarding appellees their attorney's fees because it applied "the wrong segregation-of-fees" standard and that award is not "sufficiently definite." In their eleventh issue, the Stroud defendants argue that the trial court's judgment is not "sufficiently definite because it suggests a quadruple recovery of attorney's fees."

▮▮▮▮▮ The trial court's award of attorney's fees includes fees related to appellees' claim for "intentional termination." "[I]f any attorney's fees relate solely to a claim for which such fees are unrecoverable, a claimant must segregate recoverable from unrecoverable fees." *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 313 (Tex.2006). Having held that the only claim on which appellees were entitled to recover was their breach-of-contract claim, we further hold that the trial court erred in its award of attorney's fees to appellees, and we remand the issue of attorney's fees to the trial court for a new trial on the issue.

We sustain the Stroud defendants' ninth and eleventh issues.

## Evidentiary Issues

In their twelfth issue, the Stroud defendants argue that they are entitled to a new trial because the trial court committed a number of errors in making various evidentiary rulings. None of these issues concern the jury findings on appellees' claim for breach of contract pertaining to their overriding royalties on production from the B & G leases for January 2004. In light of our other holdings, which require a remand of this case for a recalculation of prejudgment interest and a new trial solely on the issue of attorney's fees, we need not address the Stroud defendants' twelfth issue.

## Conclusion

Having overruled the Stroud defendants' eighth issue and sustained their first issue, we need not address their second issue concerning damages.

We reverse and render judgment in favor of the Stroud defendants on all claims brought by appellees except for their breach-of-contract claim pertaining to their overriding royalties on production from the B & G leases for January 2004. We remand for a new trial on the issue of attorney's fees and a recalculation of prejudgment interest.

Justice KEYES dissenting.

EVELYN V. KEYES, Justice, dissenting.

I respectfully dissent. This a case of first impression regarding the lessee's intentional wash-out of overriding royalty owners' interests in two oil and gas leases in Galveston County, Texas (the "Bowers and Gordon Leases" or "the B & G Leases") in the absence of a surrender clause or release permitting the lessee to terminate the Lease at will and despite provisions in the Leases treating the lessee's actions as breach of the rights of the overriding royalty interest owners. I would hold that appellants, Stroud Production, L.L.C. ("Stroud Production"), Plantation Petroleum Corporation ("Plantation"), and Robert A. Stroud, (collectively, the "Stroud Defendants") conspired to and did tortiously interfere with contracts (the "Assignments") assigning overriding royalty interests ("ORRIs") in the production from the B & G Leases to appellees, Patrick E. Hosford, Morris L. Etheridge, David T. Threinen, and Nelson E. Woods (collectively the "Assignees" or the "ORRI Owners") by causing appellant Plantation, the Lessee in the B & G Leases, to breach

obligations owed to the ORRI Owners under the Leases and to repudiate the Leases, washing out the royalty interests of the ORRI Owners and converting the royalties due the ORRI Owners under the B & G Leases to the Stroud Defendants' own benefit.

I would affirm the judgment in favor of appellees, the ORRI Owners.

### The ORRI Assignments and the Bowers and Gordon Leases

As the majority states, in June 1978, the Houston Domestic Oil Company ("HDOC"), of which Hosford was president, obtained the B & G Leases: two oil and gas leases on a 50 acre parcel of land in Galveston County, Texas. Hosford signed the B & G Leases in his capacity as president of HDOC. The Lessors, Bowers and Gordon, retained a 25% royalty interest and the original Lessee, HDOC, obtained a 75% working interest.

Also in 1978, HDOC assigned to Hosford, Etheridge, Threinen, and Woods, by separate individual Assignment contracts, a 5% overriding royalty interest, or ORRI, in production from the B & G Leases. Each of the Assignments was executed by an officer of HDOC and recited that it was conveyed "[f]or and in consideration of Ten and No/100ths Dollars ($10.00) and other good and valuable consideration."

The Assignments "transfer[red,] assign[ed,] and convey[ed]" to the Assignees, "under the terms and conditions hereinafter set forth, the following described overriding royalty interests on and with respect to oil and gas produced pursuant to the following described Oil and Gas Leases." The referenced B & G Leases contained a number of provisions material to this appeal, including the assignment provisions.

First, both of the B & G Leases granted an ownership interest in the land described by the Leases "exclusively unto said Lessee [HDOC] for the sole and only purpose of investigating, exploring, prospecting, drilling and operating for, developing and producing oil and gas."

Both of the Leases had a primary term of one year and were to remain in effect thereafter for so long as oil or gas was produced in commercial quantities. Both further provided,

If within thirty (30) days prior to the expiration of the primary term hereof, or at any time or from time to time after the expiration of the primary term hereof, oil or gas is being produced from said lands, or from lands pooled therewith, and all such production ceases and this lease is not otherwise continued in force, this lease shall not terminate if additional drilling or reworking operations are commenced or resumed on said lands, or on lands pooled therewith, within ninety (90) days after such cessation of production, and this lease shall continue in force so long as any such operations on the same or successive wells are prosecuted with no cessation of more than ninety (90) consecutive days; and, if such operations result in production of oil or gas, then this lease shall, subject to the other provisions hereof, continue in force as long thereafter as oil or gas is produced from said lands, or from lands pooled therewith, in commercial quantities.

Each Lease further provided,

If the Lease is not being maintained in force and effect by continuous drilling or reworking operations after the expiration of the primary term, as above provided, then this lease shall automatically terminate as to said lands, SAVE AND EXCEPT from the surface down to 100 feet below the stratigraphic equivalent

of the deepest producing zone or formation in and under:

> (1) each well situated on said lands producing oil in paying quantities "together with forty (40) acres around such well, and such remaining acreage after completion of the first well thereon as is included in an oil unit formed pursuant to the provisions hereof. . . .

In addition, each Lease provided,

> *Should Lessee be prevented* from complying with any expressed or implied covenant of this lease, from conducting drilling or reworking operations on said lands, *ox from product[ion] of oil or gas therefrom by reason of scarcity or inability, after effort made in good faith to obtain equipment or material,* or authority to use same, or by failure of carriers to transport or furnish facilities for transportation, or by operations of force majeure, or federal or state law, or any cause beyond Lessee's control, *then, while so prevented, Lessee's obligation to comply with such covenant shall be suspended and Lessee shall not be liable for damages for failure to comply therewith,* and this lease shall be extended while and so long as Lessee is prevented by any such cause from conducting drilling or reworking operations on or from producing oil or gas from said lands and the time while Lessee is so prevented shall not be counted against Lessee. . . .

(Emphasis added). Each Lease provided that it be recorded in the appropriate records of the county in which the Lease was located, and the Leases were so recorded.

Finally, both of the B & G Leases provided that the rights of either party to the Lease could be "assigned in whole or in part and as to any mineral covered hereby and to any extent, and the provisions hereof shall extend to their heirs, successors and assigns. . . ." The assignment provision concluded:

> *In the event of assignment or sublease hereof* in whole or in part, *liability for breach of any obligation expressed or implied hereunder shall rest exclusively upon the owner or sublessee* of this lease or a portion thereof *who commits such breach. Drilling or production on any portion of said lands shall inure to the benefit of the owners of this lease and of any and all portions thereof.*

(Emphasis added).

The ORRI Assignments were all executed pursuant to this provision, and, therefore, by virtue of those Assignments, production on any portion of the B & G Leases inured to the Assignees' benefit as part owners of the Leases, and any breach of an express or implied obligation under the Leases rested exclusively upon the owner or sublessee of the Lease, or a portion of it, who committed the breach.

As the majority states, HDOC drilled wells that produced oil in commercial quantities, and the ORRI Owners, according to their Assignments, received payments for their overriding royalty interests in the B & G Leases from 1978 until the end of December 2003, when Plantation acquired the B & G Leases after a number of assignments of ownership interests in the intervening years.

Promptly upon Plantation's acquiring the Bowers and Gordon Leases, the sole existing well on the B & G Leases "collapsed," the Stroud Defendants, acting through Plantation, terminated the B & G Leases, ceased paying royalties to the ORRI Owners, and entered new leases that excluded the ORRI Owners, washing out their interest. This litigation ensued.

Following trial, the jury found that (1) Plantation failed to comply with the agreement to pay the ORRI Owners over-

riding royalties from the B & G Leases for January 2004; (2) Plantation "intentionally terminate[d] the [B & G] Leases to destroy [the ORRI Owners'] rights to their overriding royalty interests"; (3) Plantation converted the ORRI Owners' "proceeds from their overriding royalty interests" in the B & G Leases; (4) Stroud Production intentionally interfered with the ORRI Owners' rights to receive their overriding royalties under the B & G Leases; (5) Stroud was responsible for the conduct of both Plantation and Stroud Production; (6) Stroud Production and Stroud conspired with Plantation with the "intent to deprive [the ORRI Owners] of the proceeds from their overriding royalty interests"; and (7) Stroud and Stroud Production conspired to damage the ORRI Owners. In a single damages question, the jury was asked to calculate an amount that would reasonably compensate the ORRI Owners for damages caused by the loss of the "unpaid overriding royalties from the [B & G] Leases" for three periods: January 1, 2004 to January 20, 2004, before production on the B & G Leases ceased, and from January 21, 2004 to January 1, 2007, and January 1, 2007 to the present, after the termination of the B & G Leases and their replacement by new leases on the same land. In its final judgment, the trial court awarded the ORRI Owners the damages found by the jury, together with pre-judgment interest and attorney's fees, including appellate attorney's fees. This appeal followed.

## Tortious Interference and Breach of Contract

In their first issue, the Stroud Defendants argue that the trial court erred in entering judgment in favor of the ORRI Owners on their claim of "intentional termination" of their rights because (1) no such claim exists under Texas law; (2) Plantation, as Lessee of the B & G Leases,

had no contractual obligation to perpetuate the B & G Leases for the benefit of the ORRI Owners; (3) Plantation owed no fiduciary duty and had no special relationship with the ORRI Owners; (4) there are no "public policy reasons for the creation of a new fiduciary duty" owed to the ORRI Owners; and (5) "the retroactive application of a fiduciary obligation" in this case "would be inequitable given Plantation's reliance on settled Texas law."

The Stroud Defendants further argue that (6) the ORRI Owners' "intentional termination" claim is not supported by legally or factually sufficient evidence because the B & G Leases expired "according to their terms" and not as a result of an intentional act committed by Plantation, and (7) the trial court erred in submitting to the jury the question on the ORRI Owners' claim for intentional termination because the question "lacked sufficient instructions to provide a standard to guide the jury in assessing the conduct of Plantation."

In their fourth issue, the Stroud Defendants argue that the trial court erred in entering judgment in favor of the ORRI Owners based upon their tortious interference claim because Plantation "never objected to the actions of its agent Stroud Production"; "the collapse" of the existing well on the B & G leases "cannot be attributed to Stroud Production"; and there was no evidence that the Stroud Defendants "sabotaged" the well. The Stroud Defendants assert that "although Stroud Production did not repair the well after its collapse, tortious interference requires a willful act."

In reply, the ORRI Owners argue that Stroud Production "made decisions about the lease" and interfered with its "contractual relationship" with Plantation, the Lessee, causing the washing out of their OR-

RIs. They also assert that the jury could have found that the failure of the only well that was sustaining the B & G Leases was not "coincidental" and that Stroud Production, as the operator, "willfully and intentionally interfered" with their ORRIs.

In sum, the Stroud Defendants contend that Plantation, as Lessee of the B & G Leases, had no contractual or fiduciary duty to the ORRI Owners under the B & G Leases or the Assignments with which the Stroud Defendants could wrongfully interfere and that Plantation had a legal right to repudiate the B & G Leases and wash out the Assignees' ORRIs without breaching or causing the breach of any duty owed to the ORRI Owners and without incurring any obligation or liability to them. The ORRI Owners deny those claims and contend that the evidence shows otherwise.

I would hold that the Stroud Defendants' argument that they are entitled to reversal of the judgment in favor of the ORRI owners because there is no cause of action for intentional termination of an oil and gas lease is without merit. The unjustified, willful, and intentional interference with the contractual rights of another by causing breach and repudiation of a contract in violation of the legal rights of the other constitutes the well-recognized cause of action for tortious interference with contract, which subsumes the other issues pled and tried in this case and on which the ORRI Owners obtained a jury verdict. I would turn to the merits of the Stroud Defendants' claims on appeal that they did not tortiously interfere with the ORRI Owners' contractual rights under the Assignments and the B & G Leases by causing the breach of those contracts.

### A. Applicable Law

This case concerns alleged tortious interference with contracts assigning ORRIs in the B & G Leases.

### 1. ORRIs and oil and gas leases

An "overriding royalty interest" is defined in Texas law as "an interest which is carved out of, and constitutes a part of, the working interest created by an oil and gas lease." *In re GHR Energy Corp.*, 972 F.2d 96, 99 (5th Cir.1992) (quoting *Gruss v. Cummins*, 329 S.W.2d 496, 501 (Tex.Civ. App.-El Paso 1959, writ ref'd n.r.e.)); *EOG Res., Inc. v. Hanson Prod. Co.*, 94 S.W.3d 697, 701 (Tex.App.-San Antonio 2002, no pet.). "Specifically, it is the share of the oil or gas produced reserved in assignment, part assignment, or sublease of an oil and gas lease payable to the assignor by the assignee over and above the royalty reserved in the lease payable to the lessor." *EOG Res.*, 94 S.W.3d at 701. Overriding royalty interests are ownership interests in land. *See id.* ("An overriding royalty is an interest in real property regarded as a covenant running with the land between the assignor and the assignee, and is enforceable by the assignor against the assignee.") (citing *Phillips Petroleum Co. v. Taylor*, 116 F.2d 994, 995 (5th Cir.1941)); *Renwar Oil Corp. v. Lancaster*, 154 Tex. 311, 276 S.W.2d 774, 776 (1955) ("[A]n oil and gas lease is ... a conveyance of realty...."); *Gruss*, 329 S.W.2d at 500 (stating that ORRI "is an interest in land").

Under Texas law, an oil and gas lease is not a "lease" in the traditional sense of a lease of the surface of real property. *Natural Gas Pipeline Co. of Am. v. Pool*, 124 S.W.3d 188, 192 (Tex.2003); *Chesapeake Exploration, L.L.C v. Dallas Area Parkinsonism Soc'y, Inc.*, No. 07–10–0397–CV, 2011 WL 3717082, at *4 (Tex.App.-Amarillo Aug. 24, 2011, no pet.) (mem. op.). Instead, "[i]n a typical oil and gas lease, the lessor is a grantor and grants a fee simple determinable interest to the lessee, who is actually a grantee." *Natural Gas Pipeline*

*Co.,* 124 S.W.3d at 192; *Chesapeake Exploration, L.L.C,* 2011 WL 3717082, at *4. The lessee's interest is "determinable" "because it may terminate and revert entirely to the lessor/grantor upon occurrence of events that the lease specifies will cause termination of the estate." *Natural Gas Pipeline Co.,* 124 S.W.3d at 192; *Chesapeake Exploration,* 2011 WL 3717082, at *4 n. 3. "The intention of the parties to a mineral lease is that minerals shall be produced from the land leased, and shared as therein specified." *Parker v. Standard Oil Co. of Kansas,* 250 S.W.2d 671, 680 (Tex.Civ.App.-Galveston 1952, writ ref'd n.r.e.).

An ORRI "is necessarily derived from a particular oil and gas lease which constitutes the assignor's mineral estate, and its validity is subject to the terms, conditions and existence of such a lease. . . . [I]t is the lease which denotes the life and breadth of the estate to be assigned." *Gruss,* 329 S.W.2d at 501. Generally, grantees and assignees under an oil and gas lease become bound by the contractual obligation of their predecessors in title. *McCormick v. Krueger,* 593 S.W.2d 729, 730–31 (Tex.Civ.App.-Houston [1st Dist.] 1979, writ ref'd n.r.e.). However, an ORRI created by assignment does not survive termination of the assigned oil, gas, or mineral rights lease unless the instrument creating the interest expressly provides otherwise. *EOG Res.,* 94 S.W.3d at 703 (holding that ORRI survived termination of oil and gas lease where assignment provided that overriding royalty would burden any extensions or renewals taken within one year of termination of underlying leases).

Rather than being a "lease" in the traditional sense, an oil and gas lease is a contract, and it is therefore interpreted as such. *Tittizer v. Union Gas Corp.,* 171 S.W.3d 857, 860 (Tex.2005). In construing a written contract, the courts examine the contract in its entirety in order to harmonize and give effect to all of its provisions so that none will be rendered meaningless. *EOG Res.,* 94 S.W.3d at 701. When two or more instruments make up a single transaction, as with the Assignments and the underlying B & G Leases in this case,[1] they are construed together as one contract. *See id.*

The language in a contract must be given its plain grammatical meaning unless to do so would defeat the parties' intent. *Baty v. Protech Ins. Agency,* 63 S.W.3d 841, 848 (Tex.App.-Houston [14th Dist.] 2002, pet. denied). When a written contract is clear and certain, the instrument will be deemed to express the intent of the parties and will be enforced as written, no matter what the actual intent may have been. *EOG Res.,* 94 S.W.3d at 701. Accordingly, the courts will enforce the intentions of the parties to an unambiguous oil and gas lease as expressed in the lease. *Tittizer,* 171 S.W.3d at 860.

Whether a contract is ambiguous is a question of law for the court. *Friendswood Dev. Co. v. McDade & Co.,* 926 S.W.2d 280, 282 (Tex.1996). If a contract is worded so that it can be given a definite or certain legal meaning, then it is not ambiguous. *Id.* When a dispute arises from the terms of an unambiguous contract, the court can determine the parties' rights and obligations under the agreement as a matter of law. *ACS Investors,*

---

**1.** *See In re Prudential Ins. Co. of Am.,* 148 S.W.3d 124, 135 (Tex.2004) (orig. proceeding) ("[A]n unsigned paper may be incorporated by reference in the paper signed by the person sought to be charged. The language used is not important provided the documents signed by the defendant . . . plainly refers to another writing") (quoting *Owen v. Hendricks,* 433 S.W.2d 164, 166 (Tex.1968)).

*Inc. v. McLaughlin,* 943 S.W.2d 426, 430 (Tex.1997).

### 2. Tortious interference

"A party to a contract has a cause of action for tortious interference against any third person who wrongly induces another contracting party to breach the contract." *Swank v. Sverdlin,* 121 S.W.3d 785, 799 (Tex.App.-Houston [1st Dist.] 2003, pet. denied); *see Holloway v. Skinner,* 898 S.W.2d 793, 794–95 (Tex.1995). The elements of a cause of action for tortious interference with a contract are: "(1) an existing contract subject to interference, (2) a willful and intentional act of interference with the contract, (3) that proximately caused the plaintiff's injury, and (4) caused actual damage or loss." *Prudential Ins. Co. of Am. v. Fin. Review Serv., Inc.,* 29 S.W.3d 74, 77 (Tex.2000); *see Holloway,* 898 S.W.2d at 795–96; *Funes v. Villatoro,* 352 S.W.3d 200, 213 (Tex.App.-Houston [14th Dist.] 2011, pet. denied); *Swank,* 121 S.W.3d at 800. To prevail on a tortious interference claim, the plaintiff must present evidence that the defendant interfered with a specific contract. *Funes,* 352 S.W.3d at 213. To establish the element of an act of willful and intentional interference, the plaintiff must produce some evidence that the defendant was more than a willing participant and knowingly induced one of the contracting parties to breach its obligations under the contract. *Id.* To do so, the plaintiff must present evidence that an obligatory provision of the contract was breached. *Id.* If there is any evidence of probative force supporting a finding of tortious interference, the court is required to uphold the jury's verdict on appeal. *See ACS Investors,* 943 S.W.2d at 430.

As an affirmative defense, a defendant may negate liability for tortious interference on the ground that its conduct was privileged or justified. *Prudential,* 29 S.W.3d at 80; *see also Wal–Mart Stores, Inc. v. Sturges,* 52 S.W.3d 711, 727 (Tex. 2001) (holding that defendant who induces breach of contract must show some justification or privilege for depriving another of benefits to which agreement entitled him). Merely inducing an obligor under a contract to do what it has a right to do is not actionable interference. *Baty,* 63 S.W.3d at 857; *see ACS Investors,* 943 S.W.2d at 431.

A party is privileged to interfere with the contractual relations of another if (1) it acts in the bona fide exercise of its own right, or (2) it has an equal or superior right in the subject matter to that of the party to the contract. *Baty,* 63 S.W.3d at 857; *see Prudential,* 29 S.W.3d at 80–81. "[T]he justification defense can be based on the exercise of either (1) one's own legal rights or (2) a good-faith claim to a colorable legal right, even though that claim ultimately proves to be mistaken." *Prudential,* 29 S.W.3d at 80. Whether an alleged act of tortious interference was privileged or the exercise of a colorable act is a question of law for the court. *Id.* Generally, justification is established as a matter of law if the acts of which the plaintiff complains are merely the defendant's exercise of its own contractual rights. *Id.* at 81. This is true regardless of the defendant's motive. *Tex. Beef & Cattle Co. v. Green,* 921 S.W.2d 203, 211 (Tex.1996); *Baty,* 63 S.W.3d at 857. "The issue of the defendant's good faith is pertinent only if the court determines that the defendant had a colorable right, but not a privilege, to engage in the conduct claimed to have interfered with a contract." *Prudential,* 29 S.W.3d at 80; *see Tex. Beef & Cattle Co.,* 921 S.W.2d at 211. A jury question is presented only when the court decides that "although no legal right to interfere exists, the defendant has nevertheless produced evidence of a good faith,

albeit mistaken, belief in a colorable legal right." *Tex. Beef & Cattle Co.*, 921 S.W.2d at 211.

## B. Application of the Law

The Stroud Defendants argue—and the majority agrees—that even though the B & G Leases contained no "surrender clause" or release, the Lessee, Plantation, had the legal right to terminate the Leases at any time by causing production to terminate on the only producing well, or, at least, by acquiescing in the cessation of production from the well, without taking any steps to restore production, with the intent of washing out the interests of the ORRI Owners. They further argue that Plantation had the right to declare the B & G Leases terminated under their own terms after ninety days had passed without production, or even during the ninety days in which production had ceased, and to induce the Lessors, Bowers and Gordon, to enter new leases on the same land and additional land on terms more advantageous to the Stroud Defendants, washing out the interests of the ORRI Owners and ending the payment of royalties to them. The Stroud Defendants contend—and the majority agrees—that they neither violated any legal or equitable right of the ORRI Owners by their actions nor caused any party to the B & G Leases to violate any obligation owed to the ORRI Owners. They argue that their actions were justified and could not constitute tortious interference with the ORRI Owners' rights as a matter of law. These contentions are, however, belied by the terms of the B & G Leases and the Assignments.

Despite the Stroud Defendants' contention that the B & G Leases granted no rights to the ORRI Owners enforceable against Plantation, each of the Leases expressly provided that the rights of the Lessee, "as to any mineral covered hereby" could be assigned and that "the provisions hereof shall extend to their heirs, successors and assigns...." The assignment provision also expressly stated that "[d]rilling or production on any portion of said lands shall inure to the benefit of the owners of this lease and of any and all portions thereof" and that, "[i]n the event of assignment or sublease hereof, in whole or in part, liability for breach of any obligation expressed or implied hereunder shall rest exclusively upon the owner or sublessee of this lease or a portion thereof who commits such breach."

In short, drilling and production on the B & G Leases inured to the benefit of the ORRI Owners, as assignees of a portion of the Lessee's mineral rights, the provisions of the Leases extended to them, and liability for any breach of the provisions of the B & G Leases rested exclusively upon the breaching party. Therefore, the question for this Court is whether the Stroud Defendants willfully and intentionally caused the Lessee, Plantation, to breach any of the provisions of the Assignments or the B & G Leases that inured to the benefit of the ORRI Owners, or whether the Stroud Defendants, including Plantation, had a legal right to act as they did that overrode any rights of the ORRI Owners.

Critically, as was pointed out in the majority opinion, none of the documents relevant to this dispute—neither the B & G Leases nor the Assignments—contained a "surrender clause," i.e., a clause that would have provided that a future Lessee, as assignee of HDOC's interests in the B & G Leases, "would be under no obligation to keep the lease in force by payment of rentals, by drilling, or by development operations, and that assignee should have 'the right to surrender any or all part of such leased acreage without the consent of assignor.'" *See Sunac Petroleum Corp. v. Parkes*, 416 S.W.2d 798, 800 (Tex.1967)

(describing lease with surrender clause). Thus Plantation had no such clause upon which to rely to excuse its failure to perform in accordance with the terms of the B & G Leases.

Instead of a clause that permitted Plantation to allow the B & G Leases to lapse without the consent of the ORRI owners, the B & G Leases imposed a number of obligations on Plantation as the Lessee that inured to the ORRI Owners' benefit and were not excused by any agreement.

Specifically, each of the B & G Leases provided for exclusive access to the Lease by the Lessee "for the sole and only purpose of investigating, exploring, prospecting, drilling and operating for, developing and producing oil and gas." After the end of the primary term of one year, each Lease provided that it was to remain in effect thereafter for so long as oil or gas was produced in commercial quantities. Each Lease further provided that it would not terminate so long as oil or gas was being produced from land subject to the B & G Leases; that, even if all production ceased and the Lease was not otherwise continued in force, the Lease would not terminate if additional drilling or reworking operations were "commenced or resumed on said lands, or on lands pooled therewith, within ninety (90) days after such cessation of production"; and that, if these operations resulted in the production of oil or gas, the B & G Leases would "continue in force as long thereafter as oil or gas is produced from said lands, or from lands pooled therewith, in commercial quantities."

In addition, each Lease provided that if it were not maintained in force and effect by continuous drilling or reworking operations, it would automatically terminate *except* "from the surface down to 100 feet below the stratigraphic equivalent of the deepest producing zone or formation in and under" each producing well "together with forty (40) acres around such well, and such remaining acreage after completion of the first well thereon as is included in an oil unit formed pursuant to the provisions hereof...."

Finally, both of the B & G Leases provided:

Should Lessee be prevented from complying with any expressed or implied covenant of this lease, from conducting drilling or reworking operations on said lands, or from producing of oil or gas therefrom by reason of ... inability, after effort made in good faith to obtain equipment or material, ... or any cause beyond Lessee's control, then, while so prevented, Lessee's obligation to comply with such covenant shall be suspended and Lessee shall not be liable for damages for failure to comply therewith, and this lease shall be extended while and so long as Lessee is prevented by any such cause from conducting drilling or reworking operations on or from producing oil or gas from said lands, and the time while Lessee is so prevented shall not be counted against Lessee...."

In short, in accepting the rights and obligations of the Lessee under the B & G Leases, Plantation obligated itself to develop the Leases and to conduct drilling, producing, and reworking operations on them unless prevented "by reason of scarcity or inability, after effort made in good faith to obtain equipment or material," or by any other "cause beyond Lessee's control." So long as its obligation to develop and operate the Leases was prevented by such causes beyond its control, the Lessee's obligations were *suspended,* not terminated; the Leases continued in force and effect; and the Lessee was not liable for breach. However, if the Lessee was not so prevented, its actions in violation of any express or implied covenant were counted

against it as breaches for which it would be liable to the owner of any portion of the Leases, including the ORRI Owners.

The Texas Supreme Court has recognized each of the covenants reflected in the B & G Leases as binding. In *HECI Exploration Co. v. Neel*, it stated:

A covenant will not be implied unless it appears from the express terms of the contract that 'it was so clearly within the contemplation of the parties that they deemed it unnecessary to express it,' ... or 'it must appear that it is necessary to infer such a covenant in order to effectuate the full purpose of the contract as whole as gathered from the written instrument.

982 S.W.2d 881, 888 (Tex.1998) (quoting *Danciger Oil & Ref. v. Powell*, 137 Tex. 484, 154 S.W.2d 632, 635 (1941)). It further stated, "Broadly categorized, we have recognized implied covenants to (1) develop, which means to drill an initial well and to reasonably develop the lease, (2) protect the leasehold, which includes protection from local and field-wide drainage, and (3) manage and administer the lease." *Id.* at 889. Finally, it held that the extent of the lessee's *implied* duties is governed by the concept of what a reasonably prudent operator would do to carry out the purposes of the lease. *Id.* Similarly, the extent of the lessee's *express* duties is governed by the plain language of the agreement in its entirety, and the language is enforced as written. *See EOG Res.*, 94 S.W.3d at 701.

Here, the plain language of the B & G Leases required Plantation to develop the Leases, protect the leasehold, and manage and administer the Lease in the interests of the parties to them—necessarily, as a prudent operator would. Nevertheless, well before the ninety-day non-continuous operations period expired, the Stroud Defendants repudiated their obligations to the ORRI Owners under the B & G Leases, washed out the ORRI Owners, obtained new leases of the *same* acreage from the B & G Lessors, lined up new investors, and, immediately upon the expiration of ninety days, restarted production from the *same* well and developed the forty acres surrounding the well for its own benefit and the benefit of the new owners to the harm of the ORRI Owners, whose ORRIs under the terms of the B & G Leases were not paid to them.[2]

On these facts, the jury found that Plantation, at the instigation of and with the active participation of the other Stroud Defendants, intentionally breached the B & G Leases and induced Bowers and Gordon to agree to terminate the B & G Leases and enter new ones on the same land, even before ninety days of non-production had expired. Plantation's stated purpose, at least in part, was to wash out the contractual legal rights of the ORRI Owners—whose interests Plantation and the other Stroud Defendants treated as likewise terminated, despite the lack of such an agreement—to the Stroud Defendants' substantial benefit and the ORRI Owners' harm.

Plantation had no legal right to cause production to cease or to fail to make good faith efforts to obtain equipment or material to produce oil or gas, even if production were prevented by a cause beyond its control. Nor did it, or its decision-maker,

---

**2.** I do not dispute the right of the Stroud Defendants to induce the Lessors, Bowers and Gordon, to agree to terminate the B & G Leases as to their own interests and to enter new leases on the same land on terms more favorable to themselves. *See ACS Investors,* *Inc. v. McLaughlin,* 943 S.W.2d 426, 431 (Tex.1997) (merely inducing obligor under contract to do what it has right to do in not actionable as intentional interference with contract).

Stroud, have a right, upon Plantation's failing to comply with the express and implied covenants in the B & G Leases, to declare the Leases terminated as to the ORRI Owners, to cease paying royalties to the ORRI owners, and to enter new leases more advantageous to themselves and harmful to the ORRI Owners' interests, without their actions being counted as breach under the terms of the B & G Leases. Plantation's legal obligations as Lessee to develop, protect, administer, and maintain the B & G Leases in the interests of all the owners, including the ORRI Owners, were clear and unambiguous. Likewise, the ORRI Owners' right to a percentage of the production from the Leases, as provided in the B & G Leases and the Assignments, was clear and unambiguous.

As the majority states, it is undisputed that HDOC drilled wells on the B & G Leases that produced oil in commercial quantities and that the ORRI Owners received overriding royalties according to their Assignments of rights under the B & G Leases from 1978 until January 2004, immediately after Plantation acquired the Leases, even though ownership of the B & G Leases had changed hands multiple times during the years. In other words, all prior Lessees had recognized their obligations to perform under the B & G Leases and the Assignments in the interest of the owners of interests in the Leases. Only the Stroud Defendants willfully and intentionally chose to cause Plantation to cease performance and to enter new leases by the actions described in the majority opinion. I disagree with the majority that Plantations' actions of washing out the ORRI Owners' interests while the B & G Leases were in force and effect actions could excuse Plantation's obligations to the ORRI Owners under their Agreements. These actions were without legal justification and in violation of the ORRI Owners' rights under the Assignments and the B & G Leases.

The Stroud Defendants contend that the B & G Leases expired by their own terms due to Plantation's ceasing production or causing production to cease and by their failing, intentionally, to make a good faith effort to obtain equipment or material to repair the well and restore production until ninety days had passed and new leases had been obtained that washed out the ORRI Owners' rights. At that point, the Stroud Defendants promptly restored production from the well and began additional operations on the same land without paying royalties to the ORRI Owners.

However, the B & G Leases had not expired by their own terms. Their own terms required that Plantation not cause production to cease by actions within its control and that it make good faith efforts to restore production when it ceased from causes beyond its control. The B & G Leases contained no terms relieving Plantation from liability for production lost when the cessation of production was within its control or when it had failed to make good faith efforts to obtain equipment and material to restore production. Instead, Plantation was expressly made liable to the ORRI Owners for any breach of the foregoing obligations.

Moreover, the B & G Leases provided that if they were not being "maintained in force and effect by continuous drilling or reworking operations" as provided in the Leases, they would "automatically terminate SAVE AND EXCEPT from the surface down to 100 feet below the stratigraphic equivalent of the deepest producing zone or formation in and under" each producing well, "together with forty (40) acres around such well, and such remaining acreage after completion of the first well thereon as is included in

an oil unit formed pursuant to the provisions hereof...." Therefore, under their own terms, the B & G Leases did not expire as to the ORRI Owners when Plantation intentionally ceased production without reaching an agreement with them to terminate the Leases, refused to pay them royalties owed for January 2004, and refused to recognize their right to royalties on production from the restored well and other wells within forty acres.

I would hold that the B & G Leases terminated as to the Lessors, Bowers and Gordon, by their agreement to terminate the B & G Leases and to enter new ones. *See Ridge Oil Co. v. Guinn Invs., Inc.*, 148 S.W.3d 143, 152–53 (Tex.2004); *Sasser v. Dantex Oil & Gas, Inc.*, 906 S.W.2d 599, 603 (Tex.App.-San Antonio 1995, writ denied). They did not terminate as to the right of the ORRI Owners to receive royalties from the producing well on the B & G Leases or on production from 100 feet beneath that well or on the surrounding forty acres, under the express terms of the B & G Leases. *See Ridge Oil*, 148 S.W.3d at 153 n. 33 (citing *Shell Oil Co. v. Stansbury*, 401 S.W.2d 623, 633 (Tex.Civ.App.-Beaumont 1966, writ ref'd n.r.e.) (holding that purported releases of particular sands not authorized by lease could not be effective except by mutual agreement of lessee and lessors)); *Cain v. Neumann*, 316 S.W.2d 915, 919–20 (Tex.Civ.App.-San Antonio 1958, no writ) (holding that terms of base lease declared that continued production of mineral maintained base lease in force regardless of ownership of mineral rights, and release by lessee of its interest, which successors to original lessors, accepted could not affect right of other owners "so long as production in fact continues").

Because (1) the Assignments of ORRIs to the ORRI Owners constituted contracts subject to interference by wrongful termination of the underlying B & G Leases, from whose terms their right to overriding royalties derived and from compliance with which the royalties themselves derived; (2) the Stroud Defendants committed willful and intentional acts of interference with the ORRI Owners' contractual rights under the Leases and Assignments; (3) the Stroud Defendants' acts of interference were a proximate cause of the ORRI Owners' failure to receive the overriding royalties due them under the B & G Leases and the Assignments in accordance with their contractual rights, and (4) the ORRI Owners suffered actual damage or loss from the Stroud Defendants' interference with their rights, I would further hold that the jury correctly found that the Stroud Defendants tortiously interfered with the legal rights of the ORRI owners, to their harm. *See Prudential*, 29 S.W.3d at 77; *Holloway*, 898 S.W.2d at 795–96; *Funes*, 352 S.W.3d at 213.

The Stroud Defendants cannot point to any legal justification for their actions in the superior legal right, such as that afforded by a surrender clause or release, for their acts of tortious interference committed against the ORRI Owners. Rather, their numerous acts of breach manifest their willful and intentional disregard of the legal obligations of the Lessee, Plantation, and of the legal rights of the ORRI Owners.

Nor can the Stroud Defendants rely on the defense that they had a mistaken "colorable legal right" to act as they did because they relied on information received by their landman and on the advice of legal counsel in doing so. As stated above, a jury question is presented when the court decides that "although no legal right to interfere exists, the defendant has nevertheless produced evidence of a good faith, albeit mistaken, belief in a colorable legal right." *Tex. Beef & Cattle Co.*, 921 S.W.2d

at 211. Here, there was no evidence of a good faith belief in a colorable legal right on the part of the Stroud Defendants to act as they did to wash out the ORRI Owners. Nor could there be one, because the rights of the ORRI Owners that they intentionally breached and caused to be breached, purportedly in reliance on legal advice, were all unambiguously set out in the Assignments and the B & G Leases. Parties who sign a lease "are charged with knowledge of all the lease provisions absent some claim that they were tricked into agreeing to them." *See In re Prudential Ins. Co. of Am.,* 148 S.W.3d 124, 134 (Tex.2004) (orig. proceeding); *Thigpen v. Locke,* 363 S.W.2d 247, 253 (Tex.1962) ("[P]arties to a contract have an obligation to protect themselves by reading what they sign.").

## C. The Majority's Construction of Case Law

Because the Stroud Defendants could not have had a good faith colorable belief in the legality of their actions as a matter of law, the question of whether they breached the underlying B & G Leases and tortiously interfered with the rights of appellants under the Assignments was a question for the jury. Any evidence of probative force supporting a finding of tortious interference requires the court to uphold the jury's verdict on appeal. *See ACS Investors,* 943 S.W.2d at 430. I would hold that there was sufficient evidence to support the jury's verdict in the ORRI owners' favor on their claims of tortious interference and all related and intertwined claims of breach and "intentional termination."

The majority agrees that the record contains evidence supporting a finding that the Stroud Defendants "intentionally terminated" the B & G leases, at least in part, to "destroy" the ORRI Owners' ORRIs in the B & G leases. However, the majority ignores the contractual duties of the Stroud Defendants under the B & G Leases and the common-law duty not to tortiously interfere with the legal rights of another without legal justification. Instead, construing a number of Texas cases in which an ORRI holders' rights have been at issue, the majority agrees with the Stroud Defendants' contention that they had no contractual or fiduciary duties to the ORRI Owners in the B & G Leases and that the ORRI Owners had no legal rights under either the B & G Leases or the Assignments subject to tortious interference by the Stroud Defendants.

I construe the case law differently—in particular, the two most closely analogous cases, *Sunac Petroleum,* 416 S.W.2d 798, and *Ridge Oil,* 148 S.W.3d 143.

In *Sunac,* Parkes, the original lessee, sold and assigned to a third party a mineral lease that was later transferred to Sunac. 416 S.W.2d at 799. Parkes reserved for himself an ORRI in production from this lease and "any extension or renewal," but Parkes' assignment of this lease to Sunac also included a surrender clause, relieving Sunac of any obligation to continue the lease. *Id.* The surrender clause provided that Sunac "would be under no obligation to keep the lease in force by payment of rentals, by drilling, or by development operations, and that assignee should have 'the right to surrender any or all part of such leased acreage without the consent of assignor [Parkes].'" *Id.* When the lessor questioned the validity of the lease held by Sunac, Sunac procured a new lease on the same land, but with different terms, and Sunac stopped paying the overriding royalties owed to Parkes under the original lease. *Id.* at 800. Parkes contended that his ORRI applied to the new lease. *Id.*

After considering the language of the leases, the supreme court concluded that the original lease had terminated and that the new lease, which was executed on "substantially different" terms, was not a renewal or extension. *Id.* at 802–03. The most important factor was the surrender clause in the assignment from Parkes to Sunac, under which Parkes' ORRI interest arose. *See id.* at 804.

The situation in *Sunac* is the exact opposite of this case, in which there was no surrender clause. Here, HDOC, the original Lessee, had assigned portions of its interest to the ORRI Owners many years before the remaining interests were assigned to Plantation in 2003. The Assignments expressly granted the ORRI Owners the protections of an owner of an interest in the Leases, including the right to payment of overriding royalties on production from the Lease, the right to performance of the obligations imposed on the Lessee by the express and implied covenants in the B & G Leases, and the right to a continuing ownership interest in production from the forty acres surrounding any well on the Leases that had expired from cessation of production for more than ninety days.

As the majority states, the supreme court observed in *Sunac* that other courts had offered protection to ORRI holders in a "washout transaction" that "involve[d] some bad faith on the part of the lessee," such as when a new lease was taken before the expiration of the original and the original lease was "simply permit[ted] . . . to expire"—exactly as happened here. *Id.* at 804 (citing *Oldland v. Gray,* 179 F.2d 408, 414–16 (10th Cir.1950)). The supreme court also stated in *Sunac* that the provisions of the leases and the assignment were "controlling." *Id.* at 805. Applying that law in this case, I would hold that the Stroud Defendants clearly breached the provisions of the B & G Leases and the Assignments protecting the ORRI Owners' interests in bad faith and that the ORRI Owners are entitled to recover damages for the breaches.

*Ridge Oil* is likewise distinguishable. In *Ridge Oil,* two lessees, Ridge and Guinn, obtained working interests in adjoining tracts of land under a single base lease. 148 S.W.3d at 147–48. The only two producing wells on the entire lease, which were sustaining the lease, were located on the Ridge tract. *Id.* at 147. Ridge devised a plan to terminate the underlying base lease and to obtain new leases on both tracts by shutting off the electricity to the two producing wells for ninety days. *Id.* at 148. After Ridge effectuated his plan and obtained new leases, Guinn sued Ridge 'for tortious interference, contending, in part, that Ridge could not lawfully wash out its interest. *Id.* at 148–49, 153. Guinn further contended that a lessee could not lawfully surrender or terminate a lease "to destroy the rights of another partial assignee of the lessee's interest." *Id.* at 155.

Without expounding upon the base lease's provisions, the supreme court in *Ridge Oil* concluded that Ridge owed no duty to Guinn to continue the original base lease or to procure its renewal or extension for Guinn and, thus, the original lease terminated by its own terms. *Id.* at 155–56, 160–61. Thus, there was no basis for a tortious interference claim. *Id.* at 161. The court justified its denial of Guinn's claim for tortious interference by distinguishing the situation in that case, where both parties were successor lessees to an original base lease, from the situation of ORRI Owners, such as those in this case, stating:

> Even if such a rule of law might be appropriate in the context of overriding royalty interests when the underlying

lease does not contain an express release provision, a question we do not address, there is a material distinction between an overriding royalty interest and that of a lessee. An overriding royalty interest is a non-participating interest. A royalty owner has no right and thus no ability to go onto the underlying property and drill or otherwise take action to perpetuate a lease. An overriding royalty interest owner is wholly dependent on the lessee to keep a lease alive. That is not true of a lessee. A lessee in Guinn's position could continue a lease in effect by drilling a well and obtaining production, or continuing operations until production is obtained, under lease provisions like those in the 1937 lease.

*Id.* at 155.

Here, the ORRI Owners had no right to enter the B & G Leases or to develop, protect, maintain, and administer them. Rather, the B & G Leases granted an ownership interest in the land described by the Leases "exclusively unto said Lessee [then, HDOC, and, by subsequent assignment, Plantation] for the sole and only purpose of investigating, exploring, prospecting, drilling and operating for, developing and producing oil and gas." The ORRI Owners were wholly dependent on the Stroud Defendants to keep the lease alive. And, while the supreme court found no evidence that Ridge Oil owed any contractual or fiduciary duties to Guinn, who was in a position to protect his own interests, there is undisputed record evidence in this case, in the form of the B & G Leases and Assignments themselves, that, as a matter of law, Plantation had a number of duties to the ORRI Owners that the record shows the Stroud Defendants intentionally and willfully caused it to breach.

In my view, *Sunac* and *Ridge Oil* do not support overturning the judgment in the ORRI Owners' favor on their claims of tortious interference with contract. Nor do the other cases of our sister courts of appeals cited by the majority support reversal of the judgment.

In *Sasser,* as in *Sunac,* the court considered claims brought by an ORRI holder who claimed that his interest had been washed out in "bad faith." 906 S.W.2d at 601–02. Sasser held an ORRI under an original lease in which Dantex, the lessee, held a 75% working interest. *Id.* at 601. However, Sasser's ORRI did not apply to renewals or extensions of the original lease, and, as in *Sunac,* the lease's terms permitted Dantex to surrender the lease unilaterally at any time. *Id.*

The court refused to impose a fiduciary duty on Dantex under these circumstances, holding that the original lease had terminated when Dantex executed the new lease "with the intent and understanding that" the original lease was released, and the court stated that it was "not material" whether there was production in paying quantities at the time. *Id.* at 603. It noted that there were no facts to establish a confidential or fiduciary relationship. *Id.* at 606–07. The court emphasized that the "contractual right to unilaterally terminate the lease, coupled with the absence of any facts justifying the imposition of a confidential or fiduciary relationship," defeated Sasser's arguments for the imposition of some type of duty of good faith. *Id.* at 607.

Here, in contrast to *Sasser,* there was no surrender clause in any of the documents relevant to this case. Instead, the B & G Leases contained express provisions that imposed duties on the Lessee to perform its obligations in good faith for the benefit of all the owners of the B & G Leases, unless prevented by circumstances beyond its control, in which case it was required to make good faith efforts to restore produc-

tion or be held liable for breach of the agreement. And if the B & G Leases terminated by cessation of production, they still continued in force and effect for the benefit of the owners, including the ORRI Owners, on the forty acres surrounding the B & G Leases to a depth of 100 feet below any formerly producing well. Every successor Lessee honored its obligations to the ORRI Owners until Plantation purchased the Lessee's interest in the B & G Leases and promptly proceeded, in conjunction with the other Stroud Defendants' willful and intentional interference, to breach their own obligations to the ORRI Owners.

*Exploration Co. v. Vega Oil & Gas Co.* is likewise distinguishable. In *Exploration Co.*, the ORRI holder under the original mineral leases argued that new leases constituted renewals and extensions of the original leases, even though they were obtained more than a year after the old leases had expired under their own terms and involved different terms and parties. 843 S.W.2d 123, 124–25 (Tex.App.-Houston [14th Dist.] 1992, writ denied). The Fourteenth Court of Appeals held that the lessee had established as a matter of law that the leasehold estate under the old leases had expired as a result of non-production, and, thus, the overriding royalty interests in the old leases also had expired. *Id.* at 125. The court followed *Sunac's* holding that "a new lease is not a 'renewal or extension' if the new lease was entered into after the old lease had already expired, new consideration exists to support the new lease, the new lease was executed under different circumstances, and the new lease contains different terms." *Id.* at 125–26. Because any assignment of rights to the ORRI holder occurred after the old lease had expired and the new leases had already been acquired, it did not convey title to the holder of the ORRI. *Id.* The court also rejected the ORRI holder's ar-

gument that a renewal and extension clause automatically imposes on the lessee a fiduciary obligation to an overriding royalty owner. The court stated that the "mere assignment of an oil and gas lease reserving an overriding royalty interest does not in itself create a confidential or fiduciary relationship between the assignor and assignee" and that, "[i]f such a relationship is created, it must be by the terms of the assignment or by other acts of the parties." *Id.* at 126.

The court in *Exploration Co.* relied on the this Court's holding in *McCormick v. Krueger* that the holder of a new lease, who had bought the leasehold equipment from the working interest owners protected by renewals and extensions clauses in their assignments, was not obligated to honor the ORRIs of the working interest owners in the prior lease where it was undisputed that the original leases had expired at the time the new leaseholder had acquired the leasehold and equipment. *Id.* at 125 (citing *McCormick*, 593 S.W.2d at 729–30). Because *Exploration Co.* and *McCormick* concerned the lack of a renewal and extension clause in a lease that expired according to its terms, they are inapplicable to this case, in which Plantation repudiated the B & G Leases as to the ORRI owners and replaced them with new leases, in violation of the B & G Leases' terms.

Similarly, in *Wagner v. Sheets & Walton Drilling Co.*, the court of appeals refused to enforce with respect to a new lease an ORRI that had burdened the original lease on the same land because the original lease provided that it expired in the absence of production at the end of the primary term, there was no provision requiring that the lease be maintained beyond its primary term, and there were no provisions in the assignments providing that overriding royalties would be continued in

new leases on the same property, even though the lessee had permitted the original lease to expire and had re-leased most of same land, "which [it] had the right to do under the [original] lease and the assignments." 359 S.W.2d 543, 544–46 (Tex. Civ.App.-Eastland 1962, writ ref'd n.r.e.); *see also Fain & McGaha v. Biesel,* 331 S.W.2d 346, 347–48 (Tex.Civ.App.-Fort Worth 1960, writ ref'd n.r.e.) (refusing to apply ORRI portion of lease that had been voluntarily surrendered to new lease where original lease permitted lessee to surrender lease at any time). *Wagner & Sheets* is distinguishable from this case in the same way that *Exploration Co.* and *McCormick* are distinguishable: the terms in the leases at in those cases were different from here and there was no breach of the lease terms.

Notably, however, the original lease at issue in *Wagner* provided—like the B & G Leases—that the original lease had *not* expired by cessation of production as to the forty acre tract around the gas well that had been drilled on the land subject to the original lease. The *Wagner* court held that, "[a]s to that 40 acres 'and no more' the lease was by its terms perpetuated," and the rights of the ORRI holders were continued as to that forty acres. 359 S.W.2d at 546. The court thus recognized, like all of the other courts cited above, that the ORRI holder's rights were controlled by the provisions in the agreements assigning them overriding royalties and in the underlying leases. *See id.* Indeed, where presented with lease terms identical to terms at issue in this case, the court of appeals held that the lease terms *did* confer rights on the ORRI holder to continued royalty payments under the new lease as provided by the original lease, a lease identical in that respect to the B & G Leases. *See id.* The majority here, however, holds to the contrary.

The two federal cases from the Unites States Court of Appeals for the Fifth Circuit cited by the majority are no different. In *Keese v. Continental Pipe Line Co.,* the federal court refused to apply to a new lease the interests of ORRI holders in the original lease that had been surrendered by the lessee, stating that, unless "the instrument creating the overriding or royalty interest makes express provision to the contrary, the interest continues or ceases with the leasehold estate out of which it is carved and cannot survive termination by surrender or release of the leasehold estate by the owners." 235 F.2d 386, 388 (5th Cir.1956). In addition, the court rejected the plaintiffs' arguments that the lessee had surrendered the lease in bad faith, observing that the "remote assignees in the leasehold chain of title[ ] were under no obligation to plaintiffs to drill or to continue to hold on to the lease" and the fact that the assignees "knew or might have known that a good well could be brought in on the property, could not have prevented them from surrendering the lease to the landowners *for any reason or for no reason at all." Id.* at 388–89 (emphasis added). The court concluded its opinion by stating that "[t]he exercise by one man of a legal right cannot be a legal wrong to another" and that, "whatever one has a right to do, another cannot have a right to complain of." *Id.* at 389 (quoting *Montgomery v. Phillips Petroleum Co.,* 49 S.W.2d 967, 971 (Tex.Civ.App.-Amarillo 1932, writ ref'd)). Again, the surrender clause controlled and gave the lessee a legal right to discontinue the lease that was superior to the rights of the ORRI holders. No such defense is available to the Stroud Defendants here.

Similarly, in *In re GHR Energy Corp.,* the Fifth Circuit considered an overriding royalty agreement that included a renewals or extensions clause but that also provided that preservation of the lease was

"solely at the will of [the lessee]." 972 F.2d at 99. Even though production never ceased, the lessee terminated the lease and entered into new leases, thereby extinguishing the overriding royalty owner's interest in the original lease. *Id.* at 98. As in the other similar cases cited above, the court held that the lessee "was free to terminate the leasehold estate" and "cut off" the overriding royalties pursuant to the lease's surrender clause, despite the fact that gas production never ceased. *Id.* at 100. Like the Texas Supreme Court in *Ridge Oil*, the court noted on rehearing, "We might well reach a different result if the facts here had suggested that [the lessee] surrendered its interest in the lease *to destroy the rights of the overriding royalty interest owner." In re GHR Energy Corp.*, 979 F.2d 40, 41 (5th Cir.1992) (op. on reh'g) (emphasis added). Notably, the court made this observation in a case where there was a surrender clause—not in a case like this one, where there is none.

Neither the reasoning nor the conclusions reached by the courts in these cases is at odds with the conclusions I have drawn from the evidence in this case. Rather, they lend themselves to the argument that when, as here, an oil and gas lease under which an ORRI holder's rights arise imposes obligations on the lessee, the decision-maker for the lessee intentionally and willfully causes the lessee to violate the terms of the lease as to the ORRI holder, and there is no surrender clause that permits the lessee to relinquish the lease at will, the royalty interest owners have a cause of action for tortious interference with their contract, a cause of action the ORRI Owners in this case pled and proved.

I agree with the majority's conclusion in this case that "we must consider the language of controlling documents and the circumstances and relationships of the par-

ties to determine whether the Stroud Defendants have committed an actionable wrong." However, the majority does not address the controlling documents in this case. Moreover, I disagree with the majority's characterization of the Stroud Defendants' actions as merely "allowing the B & G leases to expire with one of their intended purposes being to extinguish appellees' interests." This characterization of the Stroud Defendants' actions is inconsistent with the facts of this case, as evinced by the provisions of the B & G Leases and the Assignments violated by the acts of the Stroud Defendants, acts recited by the majority itself and, in my view, correctly found by the jury to constitute tortious interference with and breach of the contract.

Moreover, I find the Stroud Defendants' argument that the Assignments granting the ORRIs did not contain any renewals or extensions clauses to be immaterial. The B & G Leases did not expire by their own terms, so that renewal or extension became an issue. Rather, the Stroud Defendants willfully breached and wrongfully terminated the B & G Leases. Nor is there any need for this Court to find a fiduciary relationship between the ORRI Owners and Plantation. The terms of the B & G Leases and the Assignments and the acts of tortious interference and breach by the Stroud Defendants suffice independently to establish the liability of the Stroud Defendants to the ORRI Owners.

I would overrule the Stroud Defendants' first and fourth issues.

### Conversion and Damages

In their third issue, the Stroud Defendants argue that the trial court erred in entering judgment in favor of the ORRI Owners based upon their conversion claim because this claim was "for contract dam-

ages," is "barred by the economic loss doctrine," and is based upon a "general debt satisfied by the payment of money." The Stroud Defendants further argue that the ORRI Owners' conversion claim is not supported by sufficient evidence because they received all the royalties they were due and had no interest in production from the leases subsequently entered by the Stroud Defendants on the same land.

In their second issue, the Stroud Defendants argue that there is no evidence to support the "only damages" awarded to the ORRI Owners because "99.9% of the damages are based on the impossibility of an expired lease generating royalties and the remaining $375 was paid in April 2010," shortly before trial. They note that the jury was instructed to consider only the "unpaid overriding royalties from the [B & G] Leases" in awarding damages, and they argue that, because it is "undisputed" that the B & G Leases "automatically terminated" according to their terms in April 2004, the ORRI Owners' damages are "zero as a matter of law." The Stroud Defendants also argue that the evidence is legally and factually insufficient to support the award of damages for the January 2004 overriding royalties because the ORRI Owners admitted to receiving those payments in 2010.

In response, the ORRI Owners assert that the "obvious measure of damages would be the [overriding royalty interest] payments that [they] would have received but for [the Stroud Defendants'] conduct" and that they "did not recover under the new leases, although the calculation of damages is based on the production from those leases." In regard to the payments for overriding royalties from January 2004, the ORRI owners do not dispute that they received payment, but they contend that the payments were not timely and were not made in full because they did not include interest. The ORRI Owners argue that, because the Stroud Defendants intentionally destroyed their ORRIs, they are entitled to recover amounts consistent with the royalties they would have received had their interests not been destroyed, interfered with, or converted.

The elements of a conversion claim are that (1) the plaintiff owned or had possession of the property or entitlement to possession; (2) the defendant unlawfully and without authorization assumed and exercised control over the property to the exclusion of, or inconsistent with, the plaintiff's rights as an owner; (3) the plaintiff demanded return of the property; and (4) the defendant refused to return the property. *Khorshid, Inc. v. Christian*, 257 S.W.3d 748, 759 (Tex.App.-Dallas 2008, no pet.). A conversion claim is appropriate when an ownership interest in mineral rights, including an ORRI, has been wrongfully appropriated. *See In re Chinn Exploration Co.*, 349 S.W.3d 805, 810 (Tex. App.-Tyler 2011, orig. proceeding.) (applying conversion doctrine in suit to recover oil and gas royalties and stating, "As part of their conversion claim, Plaintiffs [mineral interest holders] must show that Chinn Exploration, unlawfully and without authorization, assumed dominion and control over the royalties attributable to Plaintiff's claimed interests to the exclusion of, or inconsistent with, Plaintiffs' rights as owners").

The measure of damages for breach of the covenant to protect an oil and gas lease is the value of the royalties lost because of the lessee's failure to act as a **reasonably prudent operator.** *Coastal Oil & Gas Corp. v. Garza Energy Trust*, 268 S.W.3d 1, 18–19 (Tex.2008). The measure of damages for conversion is the amount necessary to compensate the plaintiffs for their loss, which is, likewise, the amount of royalty payments they would have received

had those payments not been converted. *See Groves v. Hanks,* 546 S.W.2d 638, 647 (Tex.Civ.App.-Corpus Christi 1976, writ ref'd n.r.e.) ("The damages in an action for conversion are measured by the sum of money necessary to compensate the plaintiff for all actual losses or injuries sustained as a natural and proximate result of the defendant's wrong."). The measure of damages for breach of contract and for tortious interference with contract is the same: the amount of money necessary to put the plaintiff in the same economic position he would have been in but for the interference with his legal rights. *Capital Title Co. v. Donaldson,* 739 S.W.2d 384, 391 (Tex.App.-Houston [1st Dist.] 1987, no writ).

The trial court asked the jury whether Plantation had converted the ORRI Owners' proceeds from their ORRIs in the B & G Leases, and the trial court instructed the jury that Plantation could be liable for conversion if it exercised dominion or control over the personal property of another without consent of the owner and to the exclusion of the owner's right of possession and use. I would hold that this was a proper instruction and that there is sufficient evidence to support the jury's verdict awarding the ORRI Owners damages for the Stroud Defendants' exercise of dominion or control over that portion of the production from the B & G Leases to which they were entitled, and, likewise, from the production from the forty acres surrounding the breached and repudiated Leases to a depth 100 feet below the well producing on those Leases at the time Plantation breached the B & G Leases.

I would overrule the Stroud Defendants' third issue.

The jury awarded the ORRI Owners the percentage interest from production from the same wells on the same property that they were entitled to under the B & G Leases. This was a proper measure of damages under any of the theories pled and tried. The jury's damages awards are consistent with the evidence concerning the royalties that the ORRI Owners would have received had the production under the subsequent leases continued, instead, under the B & G leases.

The Stroud Defendants argue, however, that the ORRI Owners' claims are barred by the economic loss rule, which provides that "[w]hen the injury is only the economic loss to the subject of a contract itself, the action sounds in contract alone." *Jim Walter Homes, Inc. v. Reed,* 711 S.W.2d 617, 618 (Tex.1986). This argument is inapplicable, as the ORRI Owners' claims sound in tortious interference with contract and conversion, and the measure of damages is the same as the measure for contract damages—the economic loss to the subject of the contract, i.e., the royalties wrongfully withheld by the Stroud Defendants from the ORRI Owners, as the jury found. The economic loss rule has no relationship to this case. *See Sharyland Water Supply Corp. v. City of Alton,* 354 S.W.3d 407, 418–19 (Tex.2011) (recognizing tortious interference with contract as tort for which economic damages may be recoverable even absent physical injury or property damage).

I would overrule the Stroud Defendants' second issue.

### Attorney's Fees

In their ninth issue, the Stroud Defendants argue that the trial court erred in awarding the ORRI Owners their attorney's fees because their claim for "intentional termination" is not a claim based in contract and such a claim, if it existed, would be a tort claim for which attorney's fees are not recoverable. The Stroud Defendants further argue that the trial court erred in awarding the ORRI Owners their

attorney's fees because it applied "the wrong segregation-of-fees" standard and that award is not "sufficiently definite." In their eleventh issue, the Stroud Defendants argue that the trial court's judgment is not "sufficiently definite because it suggests a quadruple recovery of attorney's fees."

The Texas Supreme Court has held that "if any attorney's fees relate solely to a claim for which such fees are unrecoverable, a claimant must segregate recoverable from unrecoverable fees." *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 313 (Tex.2006). However, in the same case, it stated:

> A recognized exception to this duty to segregate arises when the attorney's fees rendered are in connection with claims arising out of the same transaction and are so interrelated that their "prosecution or defense entails proof or denial of essentially the same facts." *Flint & Assoc. v. Intercontinental Pipe & Steel, Inc.*, 739 S.W.2d 622, 624–25 (Tex.App.-Dallas 1987, writ denied). Therefore, when the causes of action involved in the suit are dependent upon the same set of facts or circumstances and thus are "intertwined to the point of being inseparable," the party suing for attorney's fees may recover the entire amount covering all claims. *Gill Sav. Ass'n v. Chair King, Inc.*, 783 S.W.2d 674, 680 (Tex.App.-Houston [14th Dist.] 1989), *modified*, 797 S.W.2d 31 (Tex. 1990) (remanded to the trial court for reexamination of attorney's fee award).

*Id.* at 311. Thus, "when discrete legal services advance both a recoverable and unrecoverable claim," the claims "are so intertwined that they need not be segregated." *Id.* at 313–14.

Here, the ORRI Owners' claims for "intentional termination" and tortious interference, although they sound exclusively in tort, are inextricably intertwined with their claims for breach of contract in that the damages in this case resulted from the Stroud Defendants interference with the B & G Leases, which caused Plantation, as the Lessee, to breach its contractual obligations to the ORRI Owners. Attorneys' fees are recoverable for breach of contract. TEX. CIV. PRAC. & REM.CODE ANN. § 38.001 (Vernon 2008); *see HMC Hotel Props. II Ltd. P'ship v. Keystone–Tex. Prop. Holding Corp.*, No. 04–10–00620–CV, 2011 WL 5869608, at *17 (Tex.App.-San Antonio Nov. 23, 2011, pet. filed) (mem. op.) (holding that party was entitled to recover attorney's fees for its tort claim arising out of allegations that lease provided it with certain rights violated by opposing party). Because the ORRI Owners are entitled to an award of attorney's fees on their claims for breach of contract, which are inextricably interrelated with their other claims, I would affirm the attorneys' fees award.

I would overrule the Stroud Defendants' ninth and eleventh issues.

### Evidentiary Issues

I agree with the majority that the Stroud Defendants failed to preserve the argument in their twelfth issue that they are entitled to a new trial because the trial court committed a number of errors in making various evidentiary rulings. The Stroud Defendants have not shown that the jury award depended in any respect on inadmissible evidence that was objected to at trial, as necessary to preserve the issue. The issue is therefore waived. *See* TEX. R.APP. P. 38.1(f).

### Conclusion

For the foregoing reasons, I respectfully dissent from the majority's holding revers-

ing and remanding this case. I would affirm the judgment of the trial court.